**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ETHICON, INC. and MEDICAL DEVICE BUSINESS SPORTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BRANDON RANDALL, <br><br> Defendant. | Case No. 3:20-cv-13524 (BRM) (ZNQ) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant Brandon Randall's ("Randall") Motion to Stay All Proceedings and Transfer Venue to the United States District Court for the District Court of Massachusetts. (ECF No. 23.) Plaintiffs Ethicon, Inc. ("Ethicon") and Medical Device Business Services, Inc. ("DePuy Synthes") (together with Ethicon, "Plaintiffs") opposed Randall's Motion and filed a Cross Motion to Enjoin Proceedings in the District of Massachusetts. (ECF No. 41.) Also before the Court is Plaintiffs' Motion for Preliminary Injunction. (ECF No. 2.) Randall opposed Plaintiffs' Motion for Preliminary Injunction. (ECF No. 29.) Plaintiffs filed a Reply in support of their Motion for Preliminary Injunction. (ECF No. 35.) Randall filed a Sur-Reply in opposition to Plaintiffs' Motion for Preliminary Injunction. (ECF No. 42.) Randall also filed a Reply in support of his Motion to Stay All Proceedings and Transfer Venue, and in opposition to Plaintiffs' Cross Motion to Enjoin Proceedings. (ECF No. 44.) Having reviewed the parties' submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good

cause having been shown, Randall's Motion to Stay All Proceedings and Transfer Venue to Massachusetts is **DENIED**, and Plaintiffs' Cross Motion to Enjoin Proceedings in the District of Massachusetts and Motion for Preliminary Injunction are **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

Ethicon and DePuy Synthes are two entities within the J&J Family of Companies (individually and/or collectively, the "Company"), which is comprised of over 260 companies and together operates one of the world's largest and most diverse medical device, pharmaceutical and consumer products companies. (ECF No. 1 ¶ 11.) Ethicon and DePuy Synthes are two key businesses within J&J's Medical Devices Business ("JJMDB") and, as wholly owned subsidiaries of J&J, are part of the Company. (*Id.* ¶ 12.) Ethicon is a New Jersey corporation, and primarily focuses on developing and creating innovative products and medical devices for use in surgery. (*Id.* ¶¶ 6, 14.) DePuy Synthes is an Indiana corporation, and focuses on implants and instrumentation for use in orthopedic surgery for the repair and healing of the musculoskeletal system. (*Id.* ¶¶ 7, 13.)

Randall is a Massachusetts resident. (*Id.* ¶ 8.) In September 2003, Randall joined Synthes, Inc. (ECF No. 29 at 6.) In 2012, DePuy acquired Synthes, Inc. to become DePuy Synthes, where Randall worked in various roles for the next seven years. (*Id.*) In June 2017, Randall accepted a position as the Senior Director, Research and Development Strategy and Business Operations for orthopedics with DePuy Synthes. (*Id.* at 7.) In connection with the Senior Director position, Randall executed an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "Agreement"). (*Id.*)

The Agreement contains a forum selection and choice of law clause, which provides:

> This AGREEMENT will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action relating to or arising out of this AGREEMENT may be brought in the courts of the State of New Jersey or in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts.

(ECF No. 1, Ex. A ¶ 6.1.) The Agreement defines "COMPETITOR" as:

> any person or entity including, but not limited to, you or anyone acting on your behalf, that is engaged or preparing to be engaged in research, development, production, manufacturing, marketing or selling of, or consulting on, any product, process, technology, machine, invention, or service in existence or under development that resembles, competes with, may now or in the future compete with, can by substituted for or can be marketed as a substitute for any product, process, technology, machine, invention or service of any COMPANY that is in existence or that is, was, or is planned to be under development.

(*Id.*, Ex. A ¶ 3.6.) The Agreement defines "CONFIDENTIAL INFORMATION" as:

> product development, product performance, product know-how, product specifications, techniques, drawings, prints, designs, and tolerances; regulatory strategies, clinical trials and investigations; manufacturing, engineering, logistics, and quality systems and related processes, data and techniques; information systems, computer programs, software, and hardware configurations; business, financial, operating, sales and marketing plans and strategies; inventions, ideas, discoveries, improvements, innovations and intellectual property strategies; pricing and pricing strategies, forecasts, contract and bidding details, financial data, models and analyses, sales volume, sales data and analyses; customer, business partner and vendor relationships and arrangements; personnel data and compensation; human resources strategies and goals, recruitment methods and plans; and training methods and procedures.

(*Id.*, Ex. A ¶ 2.1.) A non-compete provision in the Agreement states:

> Except as provided in Section 3.3 below, you agree that, for a period of eighteen (18) months after the termination of your employment within the COMPANY (whether voluntary or involuntary), you will not directly or indirectly perform, or assist others to perform, work for a COMPETITOR in a position or in any geographical location

> in which you could disadvantage the COMPANY or advantage the
> COMPETITOR through (a) your disclosure or use of
> CONFIDENTIAL INFORMATION and/or (b) your use of the
> COMPANY's CUSTOMER relationships and goodwill.

(*Id.*, Ex. A ¶ 3.2.) Section 3.3, which provides an exception to Section 3.2, sets forth the

preconditions Randall must satisfy before working for a competitor of Plaintiffs:

> After the termination of your employment within the COMPANY,
> you may work for a COMPETITOR provided that (a) the competitor
> has a DIVERSIFIED BUSINESS; (b) the role you seek to perform
> is not a role in which the COMPETITOR could benefit from the
> CONFIDENTIAL INFORMATION to which you had access during
> the last two (2) years of your employment within the COMPANY;
> and (c) before you accept the position and begin work for the
> COMPETITOR, the COMPANY is provided, and has accepted as
> satisfactory to it, written assurances from both you and the
> COMPETITOR that you will not be rendering any services which
> conflict with the obligations in this AGREEMENT.

(*Id.*, Ex. A ¶ 3.3.) Section 3.4 describes a required procedure upon an employee's voluntary

resignation:

> In the event of a voluntary termination of your employment from the
> COMPANY, including a resignation, you agree to notify your
> EMPLOYER in writing at least fourteen (14) days before your
> anticipated last day of employment. You also agree during the
> eighteen (18) months after your employment ends to provide your
> EMPLOYER with fourteen (14) days' written notice of any new
> employment or any change in position with a COMPETITOR before
> assuming the new role to allow for the opportunity to obtain written
> assurances satisfactory to the COMPANY from you and from the
> COMPETITOR that you will not be rendering services which
> conflict with the obligations in this AGREEMENT.

(*Id.*, Ex. A ¶ 3.4.) Section 5.1 provides the remedies for a breach of the Agreement:

> You agree and acknowledge that your breach of the covenants
> contained in this AGREEMENT will cause irreparable harm to the
> COMPANY and that damages arising out of a breach may be
> difficult to determine. You therefore agree and acknowledge that, in
> addition to all other remedies provided at law or by equity, the
> COMPANY shall be entitled to specific performance and temporary
> and/or permanent injunctive relief, from any court of competent

4

> jurisdiction restraining the breach or further breaches from you, your new employer or others acting in concert with you, without the necessity of the COMPANY proving actual damages or posting of a bond.

(*Id.*, Ex. A ¶ 5.1.)

Randall's position with DePuy Synthes ended in October 2019, when he joined Ethicon as its Senior Director for Integration Programs, Robotics and Digital Solutions. (ECF No. 29 at 13.) On August 31, 2020, Randall announced his resignation from Ethicon, and accepted a position of Vice President R&D, Robotics and Surgical Enablers ("Head of Robotics") with Smith & Nephew plc ("Smith & Nephew"). (*Id.* at 14.) Plaintiffs claim they and Smith & Nephew are both developing innovative and key enabling technologies for state-of-the-art medical device systems involving robotics, navigation, augmented reality, and visualization including in the areas of wound closure, trauma, orthopedic, and joint reconstruction surgery. (ECF No. 1 ¶ 3.) As a result, Plaintiffs now seek an injunction to prevent irreparable harm as a result of the impending threat by Randall to assume the Head of Robotics position with Smith & Nephew in breach of the Agreement, because, *inter alia*, Randall allegedly had access to competitively critical trade secret and confidential information of Plaintiffs directly related to this Head of Robotics position, with which he could significantly disadvantage Plaintiffs by his use or disclosure of such confidential information. (*Id.* ¶ 1.)

### B.    Procedural History

On September 29, 2020, Plaintiffs filed a Complaint against Randall for breach of contract in this Court (*id.*), along with an Order to Show Cause with Temporary Restraints seeking a Temporary Restraining Order and Preliminary Injunction to enjoin Randall from directly or indirectly performing work for Smith & Nephew in any position in which he could disadvantage Plaintiffs or advantage Smith & Nephew or any other competitor of the Company by the disclosure

or use of confidential information to which he had access while employed with Plaintiffs, or taking any action to disturb the status quo (ECF No. 2). On October 5, 2020, the Court entered into a Temporary Restraining Order by consent ("Consent Injunction"), in which Randall agreed to refrain from working for Smith & Nephew as its Head of Robotics or in any other position that would require him to breach his obligations under the Agreement until the day of the evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction.[1] (ECF No. 14.) On October 17, 2020, Randall filed a declaratory judgment action against Plaintiffs in the District Court for the District of Massachusetts seeking to have the Agreement declared void and unenforceable (the "Massachusetts Lawsuit"). *Randall v. Ethicon, Inc. et al*, No. 1:20-cv-11870 (D. Mass. filed Oct. 17, 2020). On October 19, 2020, Randall filed a Motion to Stay All Proceedings and Transfer Venue to Massachusetts. (ECF No. 23.) On October 27, 2020, Randall opposed Plaintiffs' Motion for Preliminary Injunction. (ECF No. 29.) On October 30, 2020, Plaintiffs filed a Reply in support of their Motion for Preliminary Injunction (ECF No. 35), opposed Randall's Motion to Transfer and filed a Cross Motion to Enjoin Proceedings in Massachusetts (ECF No. 41). On November 6, 2020, Randall filed a Sur-Reply in opposition to Plaintiffs' Motion for Preliminary Injunction. (ECF No. 42.) On November 9, 2020, Randall filed a Reply in support of his Motion to Stay All Proceedings and Transfer Venue, and in opposition to Plaintiffs' Cross Motion to Enjoin Proceedings. (ECF No. 44.)

---

[1] The Court did not hold an evidentiary hearing, because, as illustrated below, there is no disputed issue of material fact that must be resolved in such a hearing before issuing the preliminary injunction. Because the Court decides to grant the preliminary injunction in favor of Plaintiffs, the Consent Injunction is transformed into a preliminary injunction.

## II.    LEGAL STANDARDS

### A.    Motion to Transfer

A motion to transfer venue is governed by 28 U.S.C. § 1404(a), which states: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." In deciding a motion to transfer, the Court must first determine whether the alternative forum is a proper venue. *Fernandes v. Deutsche Bank Nat'l Trust Co.*, 157 F. Supp. 3d 383, 389 (D.N.J. 2015); *see* 28 U.S.C. § 1391. Venue is appropriate in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

When a plaintiff has laid a proper venue, "[t]he decision whether to transfer falls in the sound discretion of the trial court." *Park Inn Int'l, L.L.C. v. Mody Enters., Inc.*, 105 F. Supp. 2d 370, 377 (D.N.J. 2000). However, "the burden of establishing the need for transfer . . . rests with the movant." *Jumara v. State Farm Ins.*, 55 F.3d 873, 879 (3d Cir. 1995).

The Court must consider three factors when determining whether to grant a transfer under § 1404(a): (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. *Liggett Grp., Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 526 (D.N.J. 2000) (citing 28 U.S.C. § 1404(a); *Jumara*, 55 F.3d at 879). These factors are not exclusive and must be applied through a "flexible and individualized analysis . . . made on the unique facts presented in each case." *Id.* at 527 (citations omitted). The first two factors have been refined into

a non-exhaustive list of private and public interests that courts should consider. *See Jumara*, 55 F.3d at 879–80.

The private interests a court should consider include: (1) plaintiff's forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses — but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). *Danka Funding, L.L.C. v. Page, Scrantom, Sprouse, Tucker & Ford, P.C.*, 21 F. Supp. 2d 465, 474 (D.N.J. 1998) (citing *Jumara*, 55 F.3d at 879). The public interests a court should consider include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.* (citing *Jumara*, 55 F.3d at 879–80).

### B.    Preliminary Injunction

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citing *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994).

In order to obtain a temporary restraining order or preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. Cty. of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors." *Id.* at 179. "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."). "A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact without first holding an evidentiary hearing." *Scanvec Amiable, Ltd. v. Chang*, 80 F. App'x 171, 176 (3d Cir. 2003) (citations omitted); *see also Elliott v. Kiesewetter*, 98 F.3d 47, 53 (3d Cir. 1996) (citing *Prof'l Plan Exam'rs of N.J., Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984)) ("A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact unless the court first holds an evidentiary hearing."). "In contrast, an injunction may issue on the basis of affidavits and other documentary evidence 'if the facts are undisputed and the relevant factual issues are

resolved.'" *Id*. (citing *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990)). A court must weigh each of the four factors to determine whether Plaintiffs have, by a clear showing, carried their burden of persuasion. *See Am. Tel. & Tel. Co. v. Winback Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (requiring a district court to weigh all four factors prior to granting injunctive relief).

## III.    DECISION

### A.    New Jersey Law Governs the Agreement

Randall maintains Massachusetts law should govern his dispute with Plaintiffs. (ECF No. 29 at 17.) He claims the choice of law clause in the Agreement is inoperative, because New Jersey has no relevance to this dispute, and all facts, circumstances and occurrences underlying this litigation occurred in Massachusetts. (*Id.*) Plaintiffs argue New Jersey law should apply, because the choice of law clause in the Agreement is valid. (ECF No. 35 at 39.) Plaintiffs contend a conflict of law analysis is not necessary here, because there is no actual conflict between relevant New Jersey law and Massachusetts law when the Agreement was executed. (*Id.*) Plaintiffs claim, even under a conflict of law analysis, New Jersey law should apply. (*Id.*) The court agrees.

"Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996). "In cases in which their jurisdiction depends upon diversity of citizenship, Federal courts must follow conflict of laws rules prevailing in the states in which they sit." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941). "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state." *Homa v. American Express Co.*, 558 F.3d 225, 227 (3d Cir. 2009) (citations omitted). Here, the case is based on diversity jurisdiction, and the Court sits in New Jersey. (ECF No. 1 ¶ 9.) Therefore, the

10

Court applies federal procedural rules and the New Jersey choice of law rules in deciding whether the Agreement's choice of law provision is enforceable.

"The Court will enforce the terms of a contract that is unambiguous on its face." *Brauser Real Estate, LLC v. Meecorp Capital Mkts., LLC*, Civ. A. No. 06-1816, 2008 U.S. Dist. LEXIS 8000, at *9 (D.N.J. Feb. 4, 2008) (citing *Statewide Realty Co. v. Fidelty Mgmt. & Research Co., Inc.*, 611 A.2d 158 (N.J. 1992)). "[C]ourts in [the Third Circuit] have repeatedly honored choice-of-law provisions that explicitly state a particular governing law without regard to conflicts of law." *Id.* (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 159 (3d Cir. 1999)). Here, Section 6.1 of the Agreement explicitly states "[t]his AGREEMENT will be governed by and interpreted according to the laws of the State of New Jersey, *without regard to its conflict of law rules*." (ECF No. 1, Ex. A. ¶ 6.1.) This shows the parties' clear and unambiguous intention to apply New Jersey law to the Agreements. Therefore, the Agreement's plain language indicates New Jersey law should govern.

A choice-of-law analysis leads to the same conclusion. In New Jersey, a choice of law clause will be upheld, unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issues and which would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992) (citing Restatement (Second) of Conflicts of Laws § 187 (1969)). As for the first prong, Ethicon is a New Jersey corporation, and Plaintiffs' ultimate parent company J&J is also a New Jersey corporation. (ECF No. 41 at 39.) Therefore, the Court cannot conclude New Jersey has no substantial

relationship to the parties or no reasonable basis for the parties' choice. As for the second prong, the parties do not identify and the Court does not discern any meaningful difference in the relevant public policies between New Jersey and Massachusetts. On the contrary, at the time the Agreement was executed, New Jersey law and Massachusetts law were substantially similar on the enforceability of noncompetition covenants. *Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 53 (1st Cir. 2020) (finding that "the states' laws are substantially similar" between New Jersey and Massachusetts on the enforceability of a "confidentiality and non-compete agreement" signed in 2015); *DePuy Spine, Inc. v. Stryker Biotech, LLC*, Civ. A. No. 98013, 2007 Mass. Super. LEXIS 260, at *9 n.3 (Mass. Sup. Ct. Apr. 17, 2007) (citations omitted) (finding "no significant difference between the law of New Jersey and that of Massachusetts on the" enforceability of non-competition covenants or agreements). The Massachusetts Noncompetition Agreement Act ("MNCA"), which represents a change of Massachusetts policy on "the requirements for an employee noncompetition agreement to be enforceable," "only applies to employee noncompetition agreements entered into on or after October 1, 2018." *Nuvasive, Inc. v. Day*, 954 F.3d 439, 444 (1st Cir. 2020) (citations omitted). The MNCA therefore does not affect the Agreement, which was entered into in 2017. (ECF No. 29 at 7.) Though Randall alleges there is a material change in his employment with Plaintiffs in October 2019, which occurred after the effective date of the MNCA (ECF No. 44 at 20), such a change in employment is irrelevant here, because it does not give rise to a new agreement to which the MNCA is applicable, and nothing in the record suggests Randall and Plaintiffs entered into a new non-compete agreement after the MNCA took effect. Therefore, the Court finds no basis to invalidate the Agreement's choice of law provision.

Accordingly, the Court concludes New Jersey law governs the Agreement.

**B.      The Court Denies Randall's Motion to Transfer**

**1.      Randall Did Not Forfeit His Right to Challenge Venue**

Plaintiffs contend Randall has forfeited the right to challenge venue (1) because of the Agreement's forum selection clause, (2) by not having previously filed a motion to dismiss pursuant to Section 1406(a) or Fed. R. Civ. P. 12(b)(3), and (3) through his voluntary, continuous participation in litigating this action, including agreeing to the Consent Injunction and conducting discovery. (ECF No. 41 at 31–33.) Randall counters his brief participation in this lawsuit does not preclude transfer. (ECF No. 44 at 33.) The Court agrees.

**a.      The Agreement's Forum Selection Clause Does Not Constitute a Waiver**

"There is no doubt that venue is waivable, 'even when premised on a forum-selection clause.'" *Corsentino v. Meyer's RV Ctrs. LLC*, Civ. A. No. 20-03287, 2020 U.S. Dist. LEXIS 128745, at *6 (D.N.J. July 22, 2020) (citations omitted). However, "[a] party's assent to a permissive forum selection clause has been found not to constitute a waiver of a party's right to claim a transferee forum as their preferred, convenient forum." *Depuy Synthes Sales, Inc. v. Gill*, Civ. A. No. 13-04474, 2013 U.S. Dist. LEXIS 154825, *20 (D.N.J. Oct. 29, 2013) (citations omitted). Here, by using the word "may," the plain language[2] of Section 6.1 of the Agreement indicates it is a permissive forum selection clause. *Id*. at *5–6 (finding the same forum selection clause to be permissive). Therefore, by signing the Agreement, Randall does not waive his right to challenge venue.

**b.      Randall Need Not File a Motion to Dismiss Before Challenging Venue**

---

[2] "Any action relating to or arising out of the Agreement *may* be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey." (ECF No. 1, Ex. A ¶ 6.1.)

Plaintiffs provide no legal authority for their argument that Randall must file a motion to dismiss before challenging venue. Such an "absence of authority is fatal to [Plaintiffs'] argument." *Hilburn v. State Dep't of Corr.*, Civ. A. No. 7-6064, 2012 U.S. Dist. LEXIS 106536, at *91 (D.N.J. July 31, 2012); *see also Rosemoor Suites, LLC v. Harleysville Lake States Ins. Co.*, 444 F. Supp. 3d 902, 907 n.5 (N.D. Ill. 2020) ("[T]he court must conclude that [the plaintiff] has waived an argument by failing to develop it adequately and by citing no legal authority."); *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001) (citing *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1057 n.5 (7th Cir. 2000)) ("[A]rguments that are unsupported by pertinent authority[] are waived."). Moreover, courts in this District have granted a motion to transfer when the movant had not previously filed a motion to dismiss. *See*, *e.g.*, *Depuy Synthes*, 2013 U.S. Dist. LEXIS 154825; *Ramada Worldwide v. Bellmark Sarasota Airport*, Civ. A. No. 05-2309, 2006 U.S. Dist. LEXIS 96543 (D.N.J. June 15, 2006). Therefore, Randall need not file a motion to dismiss before filing his motion to transfer.

### c.     Randall Does Not Waive His Right to Challenge Venue by Actively Litigating This Case

A defendant may waive its right to challenge venue "by actively litigating the suit." *Koninklijke Philips N.V. v. ASUSTeK Comput. Inc.*, Civ. A. No. 15-1125, 2017 U.S. Dist. LEXIS 111889, at *7 (D. Del. July 19, 2017) (citing *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 882 (Fed. Cir. 1997)). However, "[a] motion to transfer venue is not deemed to have been waived if not raised in an initial response to the complaint." *Tatum v. Chrysler Grp., LLC*, Civ. A. No. 10-4269, 2011 U.S. Dist. LEXIS 113503, at *14 (D.N.J. Oct. 3, 2011) (citations omitted). "[A] motion to transfer venue could have been made even after a motion to dismiss has been denied." *Id.* (citing *Ins. Co. of N. Am. v. Ozean/Stinnes-Linien*, 367 F.2d 224, 227 (5th Cir. 1966)). The early stage of a case speaks against finding a waiver of the right to challenge venue. *Infinity*

*Comput. Prods. v. OKI Data Ams., Inc.*, Civ. A. No. 12-6797, 2018 U.S. Dist. LEXIS 29231, at *18–19 (E.D. Pa. Feb. 23, 2018) (declining to "find forfeiture of the improper venue arguments" when the cases "[we]re still in their very early stages").

Here, Randall filed the motion to transfer approximately 20 days after commencing this litigation. By the time of filing, Randall had only participated in preparing the Consent Injunction and some discovery, and did not file an answer or any other motion. Courts in this District have declined to find a waiver of the right to challenge venue when the case was at a much later stage. *See, e.g.*, *Tatum*, 2011 U.S. Dist. LEXIS 113503, at *14–15 (finding "the fact that [d]efendant first filed its [m]otion to [t]ransfer [v]enue nine months after the filing of the original [c]omplaint d[id] not waive its ability to seek" venue transfer); *Dibsie v. Gulf Stream Coach, Inc.*, Civ. A. No. 07-5798, 2008 U.S. Dist. LEXIS 41652, at *13–14, 27 n.6 (D.N.J. May 28, 2008) (declining to find a waiver when the defendant litigated the case for more than two months, and had filed an answer, asserted cross-claims, participated in an initial scheduling conference, prepared initial disclosures, agreed to appear at a scheduling conference, and commenced discovery); *Staats v. Robinson Helicopter Co.*, 1989 U.S. Dist. LEXIS 1781, at *10–11 (D.N.J. Feb. 22, 1989) (declining to find the defendant waived its right to seek venue transfer, despite a "five-month period between the removal of this action" and the defendant's filing of a motion to transfer). Therefore, the Court declines to find Randall waived his ability to challenge venue due to his participation in the litigation.

### 2.    The First-Filed Rule Disfavors Transfer

Plaintiffs argue the first-filed rule establishes this Court to be the proper venue, and the parallel and second-filed Massachusetts Lawsuit should be enjoined. (ECF No. 41 at 24.) Randall

counters the first-filed rule does not unilaterally mandate that the first court must retain the first-filed action and enjoin the subsequent one. (ECF No. 44 at 35.) The Court finds the first-filed rule weighs in favor of Plaintiffs, but it is not dispositive.

The applicability of the first-filed rule is a procedural question. *Chavez v. Dole Food Co.*, 836 F.3d 205, 210 (3d Cir. 2016). Therefore, federal law governs. *See Gasperini*, 518 U.S. at 427 (holding that federal courts sitting in diversity should apply federal procedural law). Under the first-filed rule, a district court has the discretion to "enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *Spellman v. Express Dynamics, LLC*, 150 F. Supp. 3d 378, 386 (D.N.J. 2015) (citing *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988)). The rule could also be the basis to deny a motion to transfer to a second-filed forum. *See Allianz Life Ins. Co. of N. Am. v. Estate of Bleich*, Civ. A. No. 08-668, 2008 U.S. Dist. LEXIS 90720, at *17 (D.N.J. Nov. 6, 2008) ("[I]n consideration of the applicability of the first-to-file rule, [d]efendants' motion [to transfer] is denied."); *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 254 F. Supp. 2d 578, 581 (E.D. Pa. 2003) (denying the defendants' motion to transfer because of the first-filed rule). "[T]he rule's primary purpose is to avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments." *E.E.O.C*, 850 F.2d at 977 (citations omitted).

There are several exceptions to the first-filed rule, including: (1) rare or extraordinary circumstances; (2) inequitable conduct; (3) bad faith; (4) forum shopping; (5) the subsequently filed action further develops the case; and (6) the first party initiated suit in one forum in anticipation of the other party's imminent suit in a less favorable forum. *Id*. Also, "the presence of a single forum selection clause," which "does not permit" commencing a lawsuit in the first-filed forum, "will almost always render the first-to-file rule inapplicable." *Chemetall*, 2016 U.S. Dist.

LEXIS 38590, at *9–10 (citing *Samuels v. Medytox Sols., Inc.*, Civ. A. No. 13-7212, 2014 U.S. Dist. LEXIS 125525, at *30 (D.N.J. Sept. 8, 2014)).

Here, the first-filed rule is applicable. First, the Massachusetts Lawsuit was filed later than this action. Second, the two actions involve the same issues. Randall is seeking to have the Agreement declared void and unenforceable in the Massachusetts Lawsuit (ECF No. 23-1 at 2), and Plaintiffs are attempting to enforce the Agreements here (ECF No. 1 ¶ 1). Third, the two actions involve the same parties. Randall filed a declaratory judgment action against Ethicon and DePuy Synthes in the Massachusetts Lawsuit (ECF No. 23-1 at 2), which are the same parties involved here. Fourth, the Court does not discern and neither party argues any exception to the first-filed rule is applicable. Therefore, this Court has the power to deny Randall's Motion to Stay All Proceedings and Transfer Venue to Massachusetts, and grant Plaintiffs' Cross Motion to Enjoin Proceedings in Massachusetts.

Also, the first-filed rule weighs against transfer here, because this District is the first-filed forum. "[T]he 'first-to-file' rule provides that priority is generally given to the first-filed suit 'absent a showing that the balance of inconvenience favors transfer or unless there are special circumstances which justify giving priority to the second suit.'" *Samuels*, 2014 U.S. Dist. LEXIS 125525, at *30 (citing *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 487 (D.N.J. 1993)); *see also Todd Shipyards Corp. v. Cunard Line, Ltd.*, 708 F. Supp. 1440, 1447 (D.N.J. 1989) (citing *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir. 1986)) ("[A]bsent special circumstances, the prior pending action has priority in venue."). Courts in this Circuit consider the first-filed rule along with the public and private interest factors in the motion to transfer inquiry, and find the first-to-file rule, when applicable, weighs in favor of trying the case in the first-filed forum. *See, e.g.*, *Diaz-Lebel v. TD Bank USA, N.A.*, Civ. A. No. 17-1611, 2017

U.S. Dist. LEXIS 187823, at *13–14 (D.N.J. Nov. 14, 2017) ("The . . . action pending in the District of Minnesota was filed more than one year before [p]laintiff filed suit in this District . . . . Since it appears this [c]ourt and the District of Minnesota have concurrent jurisdiction over a substantially-similar class action, the first-to-file rule . . . weighs in favor of transfer to the District of Minnesota."); *Synthes, Inc. v. Knapp*, 978 F. Supp. 2d 450, 463 (E.D. Pa. 2013) ("[T]he public and private interests favor transferring this action to the [first-filed forum]. The first-filed rule also counsels in favor of transfer because there are no exceptions justifying departure from the rule."); *Gielata v. Heckmann*, Civ. A. No. 10-378, 2010 U.S. Dist. LEXIS 106674, at *20 & n.92 (D. Del. Oct. 6, 2010) (denying the defendant's motion to transfer, because "[t]he private and public interest factors d[id] not strongly weigh in favor of transfer," and "the first filed rule . . . weigh[ed] against transfer"); *Armstrong World Indus. v. Congoleum Corp.*, Civ. A. No. 09-3618, 2009 U.S. Dist. LEXIS 152915, at *10–11 (E.D. Pa. Dec. 29, 2009) (rejecting the defendant's argument that "'first-filed rule would not control' the transfer analysis in this case," and finding the "case satisfie[d] the parameters and goals of the first-filed rule and should be transferred to the District of Delaware"); *Devorris*, 2007 U.S. Dist. LEXIS 46638, at *19 ("[T]he first-filed rule can be considered as one factor in the more general transfer analysis under § 1404(a).").

However, "[t]he first-filed rule is not a hard-and-fast rule; rather, the Section 1404 factors must also be considered." *In re Complaint of Weeks Marine, Inc.*, Civ. A. No. 16-1463, 2016 U.S. Dist. LEXIS 77808, at *10 (D.N.J. June 14, 2016); *see also Ivy-Dry, Inc. v. Zanfel Labs., Inc.*, Civ. A. No. 08-4942, 2009 U.S. Dist. LEXIS 53307, at *8–9 (D.N.J. June 24, 2009) ("In addition to the first-filed rule, on a motion to transfer or dismiss, a court must take into account the same factors as those used in a motion to transfer pursuant to 28 U.S.C. § 1404(a)."); *Devorris v. Cummings Inc.*, Civ. A. No. 06-183, 2007 U.S. Dist. LEXIS 46638, at *19 (W.D. Pa. June 26, 2007) (citing

*Zimmer Enters., Inc. v. Atlandia Imps., Inc.*, 478 F. Supp. 2d 983, 989–90 (S.D. Ohio 2007)) ("[A] finding that the first-filed rule is applicable does not preclude a transfer to the forum where the second action was filed. The inquiries are separate and distinct, and the former does not control the latter."). Therefore, before making the final decision on the motion to transfer, the Court must conduct a Section 1404(a) analysis.

### 3.    The Court Denies Randall's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)

#### a.    The District of Massachusetts Is a Proper Venue

"In deciding a motion to transfer under § 1404(a), the court must first determine whether the alternative forum is a proper venue, *i.e.*, a district wherein the action 'might have been brought.'" *Jacobs v. Cider Mill Farms*, Civ. A. No. 99-2832, 1999 U.S. Dist. LEXIS 21296, at *4–5 (D.N.J. Oct. 25, 1999). A venue is proper if it is "a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(b)(1). "If venue in the requested district is proper, then the Court must analyze a series of private and public factors to determine whether 'on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.'" *Virag, S.R.L. v. Sony Comput. Entm't Am. LLC*, Civ. A. No. 14-4786, 2015 U.S. Dist. LEXIS 39910, at *8–9 (D.N.J. Mar. 30, 2015) (citing *Jumara*, 55 F.3d at 879). Here, the sole defendant, Randall, currently is, and was at all times material hereto, a Massachusetts resident. (ECF No. 23-1 at 3.) Therefore, the District of Massachusetts is a proper venue, and the Court will proceed with the analysis of the private and public interest factors.

#### b.    The Agreement's Forum Selection Clause Disfavors Transfer, But Will Not Render the Private Interest Factors Irrelevant

Plaintiffs argue, because of the Agreement's forum selection clause, this Court should disregard the parties' private interests, and only consider the public interest factors. (ECF No. 41

at 37.) Randall counters, because the forum selection clause here is permissive, the traditional §
1404 analysis should apply in its entirety. (ECF No. 44 at 22.) The Court finds the permissive
forum selection clause undercuts but does not negate the weight of private interest factors.

When an exclusive forum selection clause is present, a court evaluating a defendant's §
1404(a) motion to transfer "should not consider arguments about the parties' private interests,"
and "must deem the private-interest factors to weigh entirely in favor of the preselected forum."
*Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 64 (2013). "Even if *Atlantic
Marine* does not apply with full force to permissive forum selection clauses, the rationale
supporting the Supreme Court's decision is persuasive." *ADP, LLC v. Lynch*, Civ. A. No. 16-1111,
2016 U.S. Dist. LEXIS 85636, at *19 (D.N.J. June 30, 2016) (citations omitted); *see also Networld
Communs., Corp. v. Croat. Airlines, D.D.*, Civ. A. No. 13-4770, 2014 U.S. Dist. LEXIS 133078,
at *13–14 n.5 (D.N.J. Sept. 23, 2014) (citing *Aamco Transmissions, Inc. v. Romano*, 42 F. Supp.
3d 700, 713 (E.D. Pa. 2014)) ("*Atlantic Marine* supports the proposition that a permissive forum
selection clause's presence nonetheless undercuts certain private interest arguments (*e.g.*, the
forum would be inconvenient for parties or witnesses)."); *Radian Guar., Inc. v. Bolen*, 18 F. Supp.
3d 635, 651 (E.D. Pa. 2014) ("[T]he existence of a forum selection clause of any kind significantly
undercuts any argument that the preselected forum is inconvenient for the parties or their
witnesses."). "Even though less deference is accorded to . . . a permissive forum selection clause,"
the defendants who seek venue transfer "'must still prove that the private and public balancing
factors outweigh the plaintiff's choice of forum, and the [c]ourt must find that the balances are
more than merely "tipped" in favor of the defendants.'" *Networld Communs*, 2014 U.S. Dist.
LEXIS 133078, at *14–15 (citing *Koger, Inc. v. O'Donnell*, Civ. A. No. 07-3091, 2007 U.S. Dist.
LEXIS 80551, at *9 (D.N.J. Oct. 31, 2007)). "That is because even under a traditional 1404(a)

analysis, the plaintiff's choice of forum should seldom be disturbed." *Lynch*, 2016 U.S. Dist. LEXIS 85636, at *19 (citing *Yang v. Odom*, 409 F.Supp.2d 599, 604 (D.N.J. 2006)); *see also Asphalt Paving Sys. v. Gannon*, Civ. A. No. 14-5518, 2015 U.S. Dist. LEXIS 75615, at *8–9 (D.N.J. June 11, 2015) (citing *Atl. Marine*, 134 S. Ct. at 583) ("Cognizant of the fact that the forum selection clause in this case is not mandatory, the [c]ourt nonetheless finds the policy underlying *Atlantic Marine* instructive. When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations.").

Here, the Agreement's forum selection clause is permissive. Therefore, it undercuts but does not negate the weight of private interest factors. Randall must prove the private and public balancing factors outweigh the forum selection clause, tipping significantly in its favor.

### c.  Private Interest Factors Favor Transfer

Randall argues the District of Massachusetts is the most appropriate venue. (ECF No. 23-1 at 3.) First, Randall insists the core facts of this dispute occurred in Massachusetts, because Randall is a Massachusetts resident, and the events giving rise to this litigation occurred in Massachusetts. (*Id.*) In particular, Randall signed the Agreement, worked for, and resigned from Plaintiffs in Massachusetts. (*Id.*) Randall asserts Plaintiffs' forum choice therefore should be given less weight. (*Id.* at 4.) Second, Randall claims New Jersey has no relevance to this dispute even though Ethicon is headquartered in New Jersey, because DePuy Synthes, rather than Ethicon, is a named party to the Agreement, and DePuy Synthes is an Indiana corporation. (*Id.*) Third, Randall contends Massachusetts is a more convenient forum for the parties. (*Id.* at 6.) Randall maintains it is inconvenient for Randall, an unemployed individual with no connections to New Jersey, to travel to New Jersey for the proceedings, while Plaintiffs have business operations and are accustomed to litigating cases in Massachusetts. (*Id.*) Fourth, Randall argues the location of the relevant

documents weighs in favor of the case being transferred to Massachusetts, because the Agreement, a seminal document here, was delivered to and executed by Randall in Massachusetts, and Plaintiffs will bear no burden by producing relevant documents in Massachusetts. (*Id.* at 7.) Fifth, Randall alleges the District of Massachusetts is the most convenient forum for all of the witnesses. (ECF No. 44 at 20.)

Plaintiffs claim the private interest factors weigh against transfer. (ECF No. 41 at 42.) First, Plaintiffs stress New Jersey is Plaintiffs' chosen forum and the designated forum in the Agreement. (*Id.*) Second, Plaintiffs assert Randall has submitted to this Court's jurisdiction and venue through the Consent Injunction and his participation in proceedings and discovery in this Court. (*Id.*) Third, Plaintiffs maintain the events giving rise to their claim, as well as the relevant evidence and defenses, are centered in New Jersey. (*Id.*) Fourth, Plaintiffs insist New Jersey is a more convenient forum for the parties, because New Jersey is the home of Ethicon and its parent J&J, and the parties have completed expedited discovery, including depositions of Randall and necessary witnesses, thereby eliminating any inconvenience to Randall. (*Id.* at 42–43.) Plaintiffs assert any allegation of inconvenience is minimized given the parties' ability (and past practice) to utilize remote tools to conduct discovery and participate in court proceedings. (*Id.* at 43.) Fifth, Plaintiffs allege the witnesses with knowledge or information pertaining to their claim and any defenses to it reside and work outside of Massachusetts, including the key witnesses who work with J&J, four of whom have been deposed by Randall. (*Id.*) Sixth, Plaintiffs argue the relevant documents are located, collected, and produced in New Jersey. (*Id.*) The Court finds the private interest factors favor transfer.

First, the factor for where the claim arose favors transfer. "[T]his factor involves a consideration of which forum constitutes the center of gravity of the dispute, its events, and

transactions." *Rosen v. Lieberman*, Civ. A. No. 16-7341, 2018 U.S. Dist. LEXIS 181005, at *12 (D.N.J. Oct. 18, 2018) (citations and internal quotations omitted). "The center of gravity analysis is a fact sensitive inquiry that seeks to identify the forum in which the operative facts giving rise to the litigation occurred." *Allied Old English, Inc. v. Uwajimaya, Inc.*, Civ. A. No. 11-1239, 2012 U.S. Dist. LEXIS 116261, at *11 (D.N.J. Aug. 16, 2012) (citations omitted). "The 'locus of the alleged culpable conduct' determines the place where the claim arose." *Id.* (citing *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988)). "When the dispute involves a contract, a court should consider where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred." *Deputy Synthes*, 2013 U.S. Dist. LEXIS 154825, *22; *see also Rosen*, 2018 U.S. Dist. LEXIS 181005, at *13 (citing *Frato v. Swing Staging. Inc.*, Civ. A. No. 10-5198, 2011 WL 3625064, at *4 (D.N.J. Aug. 17, 2011)) ("In contract actions, 'the factors determining where the claim arose include where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred.'"); *Domtar AI, Inc. v. J.D. Irving, Ltd.*, Civ. A. No. 14-0727, 2014 U.S. Dist. LEXIS 58380, at *16 (E.D. Pa. April 25, 2014) (finding that the factor for where the claim arose favored transferring the case to Georgia, where most of the events giving rise to the contract claim occurred, including the employment agreement's negotiation, execution, and performance, and the defendant's resignation announcement).

Here, Randall executed the Agreement, announced resignation from Plaintiffs and accepted an offer from Smith & Nephew in Massachusetts. (ECF No. 23-1 at 5.) Also, Randall performed the Agreement primarily in Massachusetts, where Randall's positions with Plaintiffs were based. (*Id.*) Plaintiffs' allegation that some events giving rise to their contract claim and certain relevant evidence are centered in New Jersey—(1) the subject of this dispute (*i.e.*, Plaintiffs' confidential

information) was administered and managed in New Jersey, and (2) a part of Randall's performance of the Agreement occurred in New Jersey, because he was required to and actually travelled to New Jersey during his employment with Plaintiffs (ECF No. 41 at 22, 40)—does not change the fact that a substantial portion of the central facts of this contract dispute occurred in Massachusetts. More importantly, the center of gravity here is in Massachusetts, where the alleged culpable conduct of Randall, *i.e.*, leaving Plaintiffs to work for a competitor, occurred. Therefore, the factor concerning where the claim arose favors Randall.

Second, the factor for the plaintiff's choice of forum disfavors a transfer, but it is not of significant weight here. "Generally, unless the defendant can show that the inconvenience to the parties strongly favors another forum, plaintiff's choice of forum should prevail." *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 219 (D.N.J. 2020) (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)). However, because the central facts of this dispute occurred in Massachusetts, the Court should give significantly less deference to Plaintiffs' choice of forum. *Depuy Synthes*, 2013 U.S. Dist. LEXIS 154825, *15 (citations omitted) ("Where the operative facts of a lawsuit occur outside the forum selected by the plaintiff, that choice is entitled to less deference."); *Santi v. Nat'l Bus. Records Mgmt., LLC*, 722 F. Supp. 2d 602, 607 (D.N.J. 2010) (citations omitted) ("[C]ourts give substantially less weight to a plaintiff's forum choice when the dispute at the heart of a lawsuit occurred almost entirely in another state.").

Third, the factor for the defendant's choice of forum favors a transfer, because Randall seeks to transfer this case to Massachusetts. Here, this factor should be given more weight, because less deference is afforded to Plaintiffs' choice of forum. *Virag*, 2015 U.S. Dist. LEXIS 39910, at *16 (citing *N. Am. Dental Wholesalers, Inc. v. Danaher Corp.*, Civ. A. No. 11-247, 2011 WL 3606866, at *5 (E.D. Pa. Aug. 15, 2011)) ("[B]ecause less deference is afforded to [p]laintiff's

choice of forum, [d]efendant's choice of forum should be given more weight.").

Fourth, the factor for the convenience of the parties is neutral. This factor requires the court to examine "the convenience of the parties as indicated by their relative physical and financial condition." *Partners of Mass., LLC v. Fantasia*, Civ. A. No. 15-7960, 2016 U.S. Dist. LEXIS 179898, at *22 (D.N.J. Dec. 28, 2016) (citing *Jumara*, 55 F.3d at 879). In this regard, Randall alleges it would be far easier for Plaintiffs to litigate this matter in Massachusetts, where they have business operations, than it would be for Randall to litigate in New Jersey, where he has no connection. (ECF No. 23-1 at 6.) These facts weigh in favor of transfer. *See ADP v. Capote*, Civ. A. No. 15-1355, 2015 U.S. Dist. LEXIS 191019, at *12 (D.N.J. July 28, 2015) (finding that it was far more convenient for the individual dependent who lived in Texas and minimally detrimental to the plaintiff company to transfer the case to Texas, where the plaintiff had a substantial presence).

However, "any travel between [New Jersey and Massachusetts], geographically close by and connected by highways, rail, and air transport as they are, will be no more burdensome than the visits [the plaintiff employee] made during his employment." *Partners of Mass.*, 2016 U.S. Dist. LEXIS 179898, at *23 (finding the factor for the convenience of the parties to be neutral). Also, the "physical presence" in a courtroom is not required to afford a party "a fair opportunity to litigate," and "the availability of technology [] can eliminate or lessen any need" of the party to travel to the forum. *Lomax v. Meracord LLC*, Civ. A. No. 13-1945, 2013 U.S. Dist. LEXIS 148555, at *14–15 (D.N.J. Oct. 16, 2013). Therefore, any alleged inconvenience of Randall is minimized by the geographical proximity between Massachusetts and New Jersey, and the parties' ability (and past practice) to utilize remote tools to conduct discovery and litigate. *See Partners of Mass.*, 2016 U.S. Dist. LEXIS 179898, at *23 (finding the geographical proximity between New Jersey

and Massachusetts undercut the defendant's alleged inconvenience in traveling from Massachusetts to New Jersey to defend the lawsuit); *id*. (declining to find the plaintiff's "personal circumstances," including "her health and age," "render[ed] the Western District of Washington a forum so seriously inconvenient as to be unreasonable" to the plaintiff as a New Jersey resident, who could have her "'day in court' without ever setting foot in a courtroom," because "the availability of technology [could] eliminate or lessen any need for" the plaintiff to travel to that forum); *Celgene Corp. v. Abrika Pharms., Inc.*, Civ. A. No. 06-5818, 2007 U.S. Dist. LEXIS 36202, at *15 (D.N.J. May 15, 2007) ("Given the proximity of this [c]ourt and the District of Delaware court, there is no reason to believe that transferring the case would be more convenient for the parties or the witnesses, or that transfer would provide easier access to evidence."). Moreover, the COVID-19 pandemic has moved most of court proceedings online, so that the parties need not be physically present in the forum for these proceedings. Accordingly, the Court finds this factor neutral.

Fifth, the factor for the convenience of the witnesses is neutral. This factor must be considered "only to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Danka*, 21 F. Supp. 2d at 474 (citing *Jumara*, 55 F.3d at 879). A district court can subpoena "a person to attend a trial, hearing, or deposition" anywhere "within 100 miles" of where that person lives or works. Fed. R. Civ. P. 45(c)(1)(A). Also, a district court has statewide subpoena power over "a party or a party's officer" in states where it lives or works. Fed. R. Civ. P. 45(c)(1)(B)(i). Similarly, non-party witnesses can be "commanded to attend a trial" in the state where they live or work, so long as their attendance would not require them to "incur substantial expense." Fed. R. Civ. P. 45(c)(1)(B)(ii). Here, neither party has demonstrated any witness would actually be unavailable for trial. Randall identifies five non-party witnesses the parties may call,

and three of them are out of the subpoena power of this Court and a Massachusetts court, because the three witnesses live or work in Ohio, California, and Indiana. (ECF No. 44 at 17–19.) Therefore, the factor for the convenience of witnesses is "neutral," because "no matter in which forum this case proceeds, certain witnesses, if unavailable for trial, would be out of the court's subpoena power." *Crowe v. Johnson & Johnson*, Civ. A. No. 15-6305, 2021 U.S. Dist. LEXIS 79713, at *8–9 (D.N.J. Apr. 26, 2021); *accord*, *Rouse v. Harley-Davidson, Inc.*, Civ. A. No. 20-528, 2021 U.S. Dist. LEXIS 13723, at *14–15 (M.D. Pa. Jan. 26, 2021).

Sixth, the factor for the location of books and records is neutral and of little weight. This factor is only relevant "to the extent that the files could not be produced in the alternative forum." *Danka*, 21 F. Supp. 2d at 474 (citing *Jumara*, 55 F.3d at 879). "[W]hen documents can be transported and/or easily photocopied, their location is entitled to little weight." *Santi*, 722 F. Supp. 2d at 608 (citing *Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 339 (D.N.J. 2003)). "[T]he technological advances of recent years have significantly reduced the weight of [this factor] in the balance of convenience analysis." *Partners of Mass.*, 2016 U.S. Dist. LEXIS 179898, at *24 (citing *Lomanno v. Black*, 285 F. Supp. 2d 637, 647 (E.D. Pa. 2003)). Here, neither party has "indicated that relevant books and records will not be available in New Jersey," *id*. at *23 (finding the factor for the location of books and records to be neutral), or "suggested that the transportation, if necessary, of the relevant documents to either forum would be unduly burdensome or expensive." *Allied Old English*, 2012 U.S. Dist. LEXIS 116261, at *19 (citing *Fasano v. Coast Cutlery Co.*, Civ. A. No. 11-3977, 2012 WL 1715233, at * 5 (D.N.J. May 15, 2012)) ("[T]he private factor regarding the location of the relevant documents is a neutral factor."). Therefore, this factor is neutral.

In sum up: (1) the factor for where the claim arose favors transfer; (2) the factor for the

plaintiff's choice of forum, which is entitled to significantly less deference here, disfavors transfer; (3) the factor for defendant's choice of forum, which is given more weight here, favors transfer; (4) the other three factors are neutral. However, the Agreement's permissive forum selection clause disfavors transfer. Therefore, though two of the six private factors favor transfer, their weight in the motion to transfer analysis is significantly undercut by the Agreement's forum selection clause.

### d. Public Interest Factors Are Neutral

Randall alleges Plaintiffs sue Randall in New Jersey in order to inconvenience and disadvantage him as an individual defendant, and therefore equity and fundamental fairness mandate transferring this case to the District of Massachusetts. (ECF No. 23-1 at 7.) Randall argues Massachusetts has an interest in adjudicating matters, as here, arising in and involving residents of Massachusetts. (*Id*.) Randall asserts the factor for the enforceability of the judgment favors transfer, because any judgment rendered against Randall ultimately must be enforced against him in Massachusetts. (ECF No. 44 at 30.) Plaintiffs maintain the public interest factors do not favor Randall, claiming Randall has not shown there is less court congestion in the District of Massachusetts than in this District. (ECF No. 41 at 39.) Plaintiffs also contend New Jersey has a local interest here, because (1) Ethicon and its parent company J&J are based in New Jersey, where Plaintiffs' central decision-making occurs; (2) the subject of this dispute (*i.e.*, Plaintiffs' confidential information) is managed in New Jersey; and (3) New Jersey has an interest in enforcing its laws that govern the Agreement. (*Id*. at 39–40.) The Court finds the six public interest factors are neutral.

First, the factor for the enforceability of the judgment is neutral. "[T]he public interest in the enforceability of the judgment is not concerned with the convenience with which the parties may obtain a judgment; rather, this factor concerns whether a judgment is capable of being

enforced at all." *In re Howmedica Osteonics Corp.*, 867 F.3d 390, 406 n.10 (3d Cir. 2017) (citing *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1225 n.3 (3d Cir. 1995)). "[I]t is unlikely that there would be any significant difference in the difficulty of enforcing a judgment rendered by one federal forum or the other." *Id*. at 410 (citing 1 James Moore et al., *Moore's Manual: Federal Practice and Procedure*, § 7.81[3][b] (2017)). Therefore, "[e]nforceability of the judgment does not favor either forum because the ultimate judgment will be enforceable in both states." *Gourmet Video, Inc. v. Alpha Blue Archives, Inc.*, Civ. A. No. 08-2158, 2008 U.S. Dist. LEXIS 87645, at *24 (D.N.J. Oct. 29, 2008) (citing *Yocham v. Novartis Pharms. Corp.*, 565 F.Supp.2d 554, 559 (D.N.J. 2008)).

Second, the factor for practical considerations that could make the trial easy, expeditious, or inexpensive disfavors transfer. "One practical consideration that supports transfer is efficiency." *Metro. Life Ins. Co. v. Bank One, N.A.*, Civ. A. No. 03-2784, 2012 U.S. Dist. LEXIS 137119, at *21 (D.N.J. Sept. 25, 2012). "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Id.* (citing *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960)). The relevant time for this practical consideration inquiry is "the time of the transfer motion." *Abbott Labs. v. Roxane Labs., Inc.*, Civ. A. No. 12-457, 2013 U.S. Dist. LEXIS 74316, at *80 (D. Del. May 28, 2013); *see also Uniloc United States v. Huawei Device United States*, Civ. A. No. 17-736, 2018 U.S. Dist. LEXIS 234545, at *14 (E.D. Tex. Sept. 6, 2018) ("[T]ransfer must be viewed at the time of filing."). By the time Randall filed his Motion to Transfer, Plaintiffs had not been served and no answer or motion had been filed in the Massachusetts Lawsuit. *Randall v. Ethicon, Inc. et al*, No. 1:20-cv-11870 (D. Mass. filed Oct. 17, 2020). At the same time, the parties here had commenced discovery and agreed upon the Consent

29

Injunction. To conserve judicial resources, it is better to have one consolidated trial in this Court. *See Samuels*, 2014 U.S. Dist. LEXIS 125525, at *32 ("Defendants cannot use their own lawsuit, filed well after [p]laintiff filed the instant action, in support of the argument that this case should be transferred in the name of judicial efficiency."); *Depuy Synthes*, 2013 U.S. Dist. LEXIS 154825, *20 (supporting transfer from New Jersey, where the case was still at an early stage, to Washington, where the case was filed first, had gone through discovery and had a trial date set).

Also, "potential delays caused by witnesses needing to travel may be considered" for the practical consideration inquiry. *Kane v. Ollie's Bargain Outlet Holdings, Inc.*, Civ. A. No. 18-3475, 2018 U.S. Dist. LEXIS 199168, at *14 (D.N.J. Nov. 26, 2018). "[T]he likelihood that parties, documents, and witnesses will have to be transported from one forum to another regardless of where this case is litigated means that 'practical considerations that could make the trial easy, expeditious, or inexpensive' do not favor either forum." *Yocham*, 565 F. Supp. 2d at 559 (citing *Jumara*, 55 F.3d at 879); *see also Gourmet Video*, 2008 U.S. Dist. LEXIS 87645, at *24 ("Practical considerations also do not favor either forum because both parties have witnesses and records located in their home states."). As discussed in Part III.B.3.c, *supra*, the parties, potential witnesses, and relevant documents here are located in both New Jersey and Massachusetts. There is a likelihood, though diminished by the availability of online tools for litigation, that the parties, witnesses, and documents will need to be transferred from one forum to another regardless of where this case is litigated. Therefore, this consideration is neutral.

Third, the factor relating to administrative difficulty and court congestion favors transfer. "Regarding the administrative difficulties associated with proceeding in either District, the Court is required to evaluate this factor in light of the relative docket congestion of the fora." *Hytera Communs. Corp. v. Motorola Sols., Inc.*, Civ. A. No. 17-12445, 2018 U.S. Dist. LEXIS 207162,

at *33 (D.N.J. Dec. 6, 2018). Plaintiffs cite the federal court management statistics through June 30, 2020, and point out that civil cases in New Jersey have a shorter median time (9.8 months) from filing to disposition than those in Massachusetts (11.0 months), which suggests a higher level of court congestions in Massachusetts. (ECF No. 41 at 39.) However, Randall claims the same set of statistics also shows the civil cases in New Jersey have a longer median time (39.4 months) from filing to trial than those in Massachusetts (32.0 months), which points to an opposite conclusion.[3] (ECF No. 44 at 31.) Randall further asserts, for the 12-month period ending June 30, 2020, the number of filings and pending cases per judgeship is much higher in the District of New Jersey (1,069 civil filings and 2,514 pending cases per judgeship) than the District of Massachusetts (217 civil filings and are 364 pending cases per judgeship).[4] (*Id.*) Taken together, the data regarding docket congestion weigh in favor of transfer.

Also, transfer is favored when the transferee court experiences a lower level of judicial emergency. *See Tu v. C.H. Robinson Worldwide*, Civ. A. No. 19-16561, 2020 U.S. Dist. LEXIS 113772, at *14 (D.N.J. June 29, 2020) (finding that the factor for administrative difficulty "weigh[ed] in favor of transfer" from the District of New Jersey to the District of Minnesota, because of the "six judicial emergencies within the District of New Jersey"); *Mehta v. Angell*

---

[3] The most recent federal court management statistics shows the civil cases in New Jersey have a longer median time (10.1 months) from filing to disposition than those in Massachusetts (9.1 months), though the median time from filing to trial for New Jersey's civil cases is unavailable. National Judicial Caseload Profile, United States Courts, (December 2020), *available at* https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2020.pdf. This supports the finding that the District of New Jersey is experiencing a higher level of court congestion.

[4] The most recent federal court management statistics shows the caseload per judgement is still much higher in the District of New Jersey (1,325 civil filings and 3,030 pending cases per judgeship) than the District of Massachusetts (208 civil filings and are 379 pending cases per judgeship). National Judicial Caseload Profile, United States Courts, (December 2020), *available at* https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2020.pdf.

*Energy*, Civ. A. No. 18-2319, 2019 U.S. Dist. LEXIS 171612, at \*23–24 (D.N.J. Sept. 30, 2019) (finding that the analysis of "the relative administrative difficulty weigh[ed] heavily in favor of transfer," because "the District of New Jersey [wa]s . . . experiencing a judicial emergency and lack[ed] six District Judges," while "[t]he District of Minnesota, on the other hand, ha[d] a full complement of District Judges"). The most recent federal court management statistics shows the District of New Jersey lacks six District Judges, though four District Judges have been nominated; while the District of Massachusetts lacks two District Judges, and one District Judge has been nominated.[5] Therefore, the consideration of judicial emergency also favors transfer.

Fourth, the factor for the local interest in deciding local controversies at home favors transfer. As discussed in Part III.B.3.c, *supra*, the alleged culpable conduct of Randall took place in Massachusetts, which therefore has a strong public interest in adjudicating the dispute. *Melone v. Boeing Co.*, Civ. A. No. 07-1192, 2008 U.S. Dist. LEXIS 25367, at \*11–12 (D.N.J. Mar. 28, 2008) (finding that "Washington ha[d] a strong local interest in this lawsuit as opposed to New Jersey," because "he alleged culpable conduct occurred in Washington"); *Cancer Genetics, Inc. v. Kreatech Biotechnology, B.V.*, Civ. A. No. 07-273, 2007 U.S. Dist. LEXIS 90857, at \*17 (D.N.J. Dec. 11, 2007) (citing *Hoffer v. InfoSpace.com, Inc.*, 102 F. Supp. 2d 556, 576 (D.N.J. 2000)) ("Typically, when a substantial amount of the alleged culpable conduct occurred in the chosen forum, that court favors retaining jurisdiction as a matter of local interest."); *Ricoh*, 817 F. Supp. at 486 (citations omitted) ("Because Minnesota is the locus of the majority of alleged culpable conduct, Minnesota has a strong public interest in adjudicating this dispute.").

Plaintiffs claim New Jersey has a local interest here in protecting in-state businesses like

---

[5] Current Judicial Vacancies, United States Courts, (May 24, 2021), *available at* https://www.uscourts.gov/judges-judicial-vacancies/current-judicial-vacancies.

Ethicon. (ECF No. 41 at 39.) But Massachusetts also has a local interest in protecting its in-state residents like Randall. *See Maliki v. Holy Redeemer Hosp.*, Civ. A. No. 15-1591, 2016 U.S. Dist. LEXIS 103169, at *6 (D.N.J. Aug. 5, 2016) ("New Jersey also has an interest in protecting its residents."). "[W]hen both states have an interest in protecting its citizens, courts in this District have found the balance to tip in favor of the State that was found to be the center of gravity of the actions giving rise to the litigation," which, in this case, is Massachusetts. *Allied Old English*, 2012 U.S. Dist. LEXIS 116261, at *22 (citations omitted); *see also Prime Hookah, Inc. v. MK Distribs., Inc.*, Civ. A. No. 19-7283, 2020 U.S. Dist. LEXIS 18707, at *18–19 (D.N.J. Feb. 5, 2020) (concluding that Massachusetts' interest was more substantial, because the alleged wrongful acts occurred there and the plaintiff did not contend it could not prosecute its claims in Massachusetts, even though New Jersey had an interest in providing a forum for a business operating there to vindicate its rights); *Lucent Techs. v. DiCon Fiberoptics, Inc.*, Civ. A. No. 05-2534, 2006 U.S. Dist. LEXIS 58283, at *15 (D.N.J. Aug. 8, 2006) (concluding "the local interest in deciding local controversies locally weigh[ed] in favor of trying this matter in California, and not in New Jersey," even though the plaintiff "ha[d] its headquarters in New Jersey," because "most of the conduct relevant to this action occurred either in California or Massachusetts").

Plaintiffs also contend New Jersey has a strong interest in ensuring noncompetition agreements subject to its laws, like the Agreement here, are enforced. (ECF No. 41 at 40.) Indeed, the fact that the contract in dispute is governed by the law of a state may support finding that state's interest in resolving the dispute. *See Allianz*, 2008 U.S. Dist. LEXIS 90720, at *17 ("[T]he [p]olicy appears to have been issued pursuant to New Jersey law, [which is] a fact that bears on the local interest in deciding the matter."); *Cancer Genetics*, 2007 U.S. Dist. LEXIS 90857, at *17 (finding that New York "ha[d] a strong local interest in this case," in part because "[t]he parties . . .

consented to be governed by New York law"). But, even so, Massachusetts has a greater local interest in deciding this case, because the accused wrongful conduct occurred there, and the Court has no reason to find the District of Massachusetts would be unable to faithfully apply New Jersey law. *See Kane v. Stoll*, Civ. A. No. 14-3748, 2014 U.S. Dist. LEXIS 87488, at *10–11 (D.N.J. June 27, 2014) (finding "[t]here [wa]s more of a local interest to have this matter decided in California . . . even assuming New Jersey law applie[d]," because the claim arose in California and "the District Court in California [wa]s fully capable of applying settled New Jersey law"). In conclusion, this factor favors transfer.

Fifth, the public policy factor is neutral. As explained in Part III.A, *supra*, the applicable public policies affecting the Agreement's enforceability are similar between New Jersey and Massachusetts.

Sixth, the factor for the trial judge's familiarity with the applicable state law weighs against transfer. "The focus of this factor is whether judges in one of the districts would have greater familiarity with the applicable state law, particularly in diversity cases." *Rosen*, 2018 U.S. Dist. LEXIS 181005, at *26 (citing *Jumara*, 55 F.3d at 879). Here, if the case were to be transferred to Massachusetts, the same New Jersey choice of law rule would apply, since a transferee court applies the choice of law principles of the transferor forum. *Ferens v. John Deere Co.*, 494 U.S. 516, 524–25 (1990) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)) ("[T]he choice-of-law rules should not change following a transfer initiated by a defendant. Transfers initiated by a plaintiff involve some different considerations, but lead to the same result."). As explained in Part III.A, *supra*, New Jersey law governs the Agreement under New Jersey choice of law rules. Therefore, if the case is transferred to Massachusetts, New Jersey law will still govern the Agreement.

"Common sense suggests that a New Jersey court would be better suited to address [the plaintiff's New Jersey state law] claims, but this assumption is not necessarily true." *Tu*, 2020 U.S. Dist. LEXIS 113772, at *16. However, even though a court might have to apply and is less familiar with another jurisdiction's law, it does not necessarily warrant transferring the case to that jurisdiction, because a court "is regularly called upon to apply the law of other jurisdictions." *Bachmann Software & Servs. v. Intouch Grp., Inc.*, Civ. A. No. 08-2025, 2008 U.S. Dist. LEXIS 55719, at *48 (D.N.J. July 21, 2008) ("[T]he fact that California law governs at least a part of this dispute does not warrant the transfer of this case to California."). Here, Plaintiffs' breach of contract claim is based on common law. As explained in Part III.A, *supra*, New Jersey law and Massachusetts law are substantially similar on the enforceability of noncompetition covenants, which indicates "this factor is essentially neutral." *FerraTex, Inc. v. U.S. Sewer & Drain, Inc.*, 121 F. Supp. 3d 432, 443 (D.N.J. 2015) (noting that nothing in the record suggested the relevant legal principles, *i.e.*, the law governing contract and quasi-contractual/equitable principles, differed significantly between New Jersey and Pennsylvania). Nevertheless, "to the extent there is any benefit to be gained by the District of New Jersey's familiarity with the New Jersey law at issue, this factor weighs against transfer." *Id.*; *see also Capote*, 2015 U.S. Dist. LEXIS 191019, at *16 (finding this factor weighed against transferring a breach of restrictive covenant case to Texas, when neither party explained how Texas and New Jersey would apply different legal standards in the context of restrictive covenants, and the contract law did not differ significantly between Texas and New Jersey).

In sum: (1) the factor for practical considerations disfavors transfer; (2) the factor relating to administrative difficulty and court congestion favors transfer, (3) the factor for the state's local interest favors transfer; (4) the factor for the trial judge's familiarity with the applicable state law

weighs against transfer; and (5) the other two factors are neutral. On balance, the public interest factors are neutral.

### e.    The Court Denies Randall's Motion to Transfer After Balancing the Above Considerations and Factors

In balancing the private interest and the public interest factors, a district court has "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Riess v. Target Corp.*, Civ. A. No. 10-737, 2010 U.S. Dist. LEXIS 59033, at *4 (D.N.J. June 15, 2010) (citing *Jumara*, 55 F.3d at 883). "[T]he defendant bears the burden of persuasion and must tip the balance 'strongly' in its favor." *Id.* (citing *EVCO Tech. & Dev. Co. v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730 (E.D. Pa 2005)). Here, the private interest factors favor transfer, but their weight is significantly weakened by the Agreement's forum selection clause, the public interest factors are neutral, and the first-filed rule disfavors transfer. Therefore, Randall has "failed to meet [his] burden to establish why transfer pursuant to 28 U.S.C. § 1404 is warranted, and in consideration of the applicability of the first-to-file rule, [his] motion is denied." *Allianz*, 2008 U.S. Dist. LEXIS 90720, at *18. Accordingly, the Court denies Randall's Motion to Transfer to Massachusetts, and grants Plaintiffs' Cross Motion to Enjoin Proceedings in Massachusetts.

### C.    The Court Grants Plaintiffs' Motion for Preliminary Injunction

### 1.    Plaintiffs Have Demonstrated a Reasonable Likelihood of Success

To state a claim for breach of contract, a party must allege: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Touzot v. ROM Dev. Corp.*, Civ. A. No. 15-6289, 2016 U.S. Dist. LEXIS 55766, at *19–20 (D.N.J. Apr. 26, 2016) (citing *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)). Here, the Court finds Plaintiffs have demonstrated a

likelihood of success against Randall on the breach of contract claim.

        **a.**      **A Contract Exists Between Plaintiffs and Randall**

Randall argues no contract exists between Randall and Ethicon, because Ethicon is not a party to the Agreement. (ECF No. 29 at 18.) Plaintiffs insist Ethicon can enforce the Agreement, because (1) the Agreement can be assigned to any entity within the Company under Section 6.4 of the Agreement, and (2) Ethicon can enforce the Agreement as an express beneficiary. (ECF No. 35 at 41.) Randall counters, even if the Agreement is assignable, it is not actually assigned to Ethicon, who therefore cannot enforce the Agreement. (ECF No. 42 at 8.) The Court finds Ethicon is entitled to enforce the Agreement.

"Courts have recognized the right of a third-party beneficiary to enforce a contract." *Lakowitz v. Brown*, Civ. A. No. A-2799-12T4, 2014 N.J. Super. Unpub. LEXIS 672, at *7 (N.J. Super. Ct. App. Div. Mar. 27, 2014) (citing *Drewen v. Bank of Manhattan Co.*, 155 A.2d 529, 532 (N.J. 1959)). The test to determine third-party beneficiary status is "whether the parties to the contract intended others to benefit from the existence of the contract." *City of Perth Amboy v. Interstate Indus. Corp.*, Civ. A. No. A-0778-14T4, 2017 N.J. Super. Unpub. LEXIS 1209, at *27 (N.J. Super. Ct. App. Div. May 17, 2017) (citing *Broadway Maint. Corp. v. Rutgers, State Univ.*, 447 A.2d 906, 909 (N.J. 1982)). Here, the Agreement "establishes certain obligations during and after" Randall's employment, which applies to Randall's current position and "any position of trust and confidence" that Randall "may hold (whether by promotion, transfer or assignment) within" the Company. (ECF No. 1, Ex. A at 29.) The Agreement expressly designates each Company as "an express third-party beneficiary of" the Agreement. (*Id.*, Ex. A ¶ 6.3.) Therefore, the parties to the Agreement expressly intended Ethicon—a Company and therefore a designated third-party beneficiary—to receive the benefit of holding Randall responsible for his obligations

under the Agreement. This allows Ethicon to enforce the Agreement. The Court in turn need not address the issue of assignment.

Accordingly, the Court concludes there is a contract between Plaintiffs and Randall, and Ethicon is entitled to enforce the Agreement as a third-party beneficiary.

### b.        The Agreement Is Valid

Plaintiffs maintain the Agreement is valid, for several reasons. First, Plaintiffs contend the Agreement is reasonably necessary to protect their legitimate business interest in their confidential information. (ECF No. 2-4 at 25–26.) Plaintiffs point out, during Randall's employment with Plaintiffs, he had access to such confidential information that should not be disclosed to a competitor. (ECF No. 35 at 20.) Second, Plaintiffs argue enforcing the Agreement would not cause Randall undue hardship, because: (1) Randall voluntarily terminated his employment, and therefore any hardship that ensued is self-imposed; (2) Plaintiffs have offered to continue to pay Randall his base salary pending the determination of Plaintiffs' application for a preliminary injunction, and Addendum A of the Agreement provides for additional payments if Randall is unable to find other comparable employment; and (3) Randall can work anywhere so long as he does not work for a Plaintiffs' competitor where he may use or disclose Plaintiffs' confidential information to Plaintiffs' detriment. (ECF No. 2-4 at 29–31.) Third, Plaintiffs contend enforcing the Agreement would not impair the public interest, because the Agreement is narrowly tailored, and its enforcement would merely promote business stability and certainty. (*Id.* at 31–32.) Fourth, Plaintiffs state the scope of the prohibited activities under the Agreement is not unreasonably broad, because the prohibition relates only to the positions Randall held in the last two years of employment. (ECF No. 35 at 42.) Plaintiffs also assert the eighteen-month restriction period is not unreasonably long, because it is standard in the industry and shorter than a typical strategic

development life cycle of two to three years. (*Id.* at 43–44.)

Randall insists the Agreement is unreasonable. (ECF No. 29 at 22.) First, Randall contends the Agreement does not protect Plaintiffs' legitimate interest in any confidential information, because (1) Plaintiffs have not specifically identified any relevant confidential information, and (2) Plaintiffs' sole purpose is to stifle competition by preventing Randall from joining Smith & Nephew. (*Id.* at 23, 26.) Second, Randall argues his resignation from Plaintiffs was not all voluntary, but out of a legitimate concern of job instability in light of recent restructurings and reductions that Plaintiffs went through. (*Id.* at 35–36.) Randall claims Plaintiffs did try to retain him by exploring other opportunities within J&J, but never extended to him a formal offer for a new position. (*Id.* at 28–29.) With no job actually offered to him, Randall considered it risky to stay with Plaintiffs as opposed to joining Smith & Nephew. (*Id.* at 30.) Third, Randall points out Plaintiffs' offer to pay him basic salary cannot eliminate his undue hardship, because the offer only provides Randall security until the Court resolves Plaintiffs' Motion for Preliminary Injunction. (*Id.* at 36.) After that, Randall alleges he would not be entitled to payments under Addendum A of the Agreement, because of his voluntary resignation. (*Id.* at 37.) Fourth, Randall maintains the Agreement imposes unreasonably broad geographic and duration limitations, and its scope of prohibited activities could cover the entire medical device field and Randall's usage of his knowledge, skill, and expertise, to obtain gainful employment in general. (*Id.* at 38–41.) The Court disagrees.

"A non-compete agreement is enforceable if it satisfies the test for reasonableness," known as the *Karlin* test or the *Solari/Whitmyer* test. *Comet Mgmt. Co. v. Wooten*, Civ. A. No. A-1892-17T1, 2020 N.J. Super. Unpub. LEXIS 390, at *15 (N.J. Super. Ct. App. Div. Feb. 25, 2020) (citations omitted). The test "requires the court to determine whether: '(1) the restrictive covenant

was necessary to protect the employer's legitimate interests in enforcement, (2) whether it would cause undue hardship to the employee, and (3) whether it would be injurious to the public.'" *Id.* (citing *Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005)). "Courts should also consider three other factors 'in determining whether the restrictive covenant is overbroad: its duration, the geographic limits, and the scope of activities prohibited.'" *Id.* (citing *More*, 869 A.2d at 897). "Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *Id.* (citing *More*, 869 A.2d at 897). The Court finds the Agreement meets the test for reasonableness.

As for the first prong, the employer's legitimate interest includes "the protection of trade secrets or proprietary information," "customer relationships," and any other "highly specialized, current information not generally known in the industry, created and stimulated by the environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment." *ADP, LLC v. Kusins*, 215 A.3d 924, 943 (N.J. Super. Ct. App. Div. 2019) (citations omitted). An employer has no legitimate interest in "preventing competition," *id.* (citing *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 581 (N.J. 1971)), or "preventing an employee from working at a competitor simply because such work would necessarily entail the use of general understanding of the industry." *ADP, LLC v. Lynch*, Civ. A. No. 16-1111, 2020 U.S. Dist. LEXIS 69603, at *49 (D.N.J. Apr. 21, 2020) (citing *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (N.J. 1988)).

Here, Plaintiffs have described a number of particular instances where Randall, due to his employment with Plaintiffs, was exposed to specific confidential information about Plaintiffs' development of their robotics and the digital surgery ecosystem. Plaintiffs have run a number of confidential and sensitive projects that Randall was allowed to participate in only after getting

special clearance: (1) Randall was directly involved in the acquisition and assessment of the Orthopedics robotic technology that underlies the VELYS system;[6] (2) Randall performed the due diligence on the acquisition of Verb Surgical, whose technologies form the foundation of the digital surgery ecosystem of JJMDB; (3) Randall participated in Project Manhattan, which was designed to evaluate different digital surgery assets acquired or originally developed by JJMDB, and to determine JJMDB's strategy going forward; (4) Randall was directly involved in a project to develop an organizational working model and workstream for the DePuy Synthes franchise for the development of the orthopedics digital strategy; and (5) Randall participated in Project Voltron, which involved confidential meetings and presentations to develop and implement J&J's "Digital Surgery Workforce Strategy" and compensation framework. (ECF No. 35 at 10–11, 18–19, 28–29.) In addition, Plaintiffs refer to a list of confidential documents, which Randall allegedly had access to due to his employment with Plaintiffs: (1) Randall worked with the JJMDB's Chief Information Officer Larry Jones on a strategic presentation, which covered sensitive and secret information about the entire digital and robotics strategy for the JJMDB; (2) Randall received a "Digital Surgery Platform Update," which contained sensitive and confidential information about JJMDB's digital surgery platform; (3) Randall sent regular confidential updates to J&J's high-level executives about the status of development activity concerning robotic and digital surgery; (4) during the meetings of a leadership team dedicated to the development of the Cross-Digital Surgery Platform, Randall was exposed to two presentation slides, which contained confidential details of various aspects of the platform's strategic initiatives and development plans; (5) Randall

---

[6] VELYS is J&J's proprietary digital surgery platform under development. *Creating a System of Connected Technologies to Transform the Future of Orthopaedic Surgery through VELYS™ Digital Surgery*, J&J Medical Devices (Dec. 9, 2019), https://www.jnjmedicaldevices.com/en-US/news-events/creating-system-connected-technologies-transform-future-orthopaedic-surgery.

incorporated in some slides and emails J&J's product development pipeline of enabling technologies and robotic products; and (6) Randall regularly received briefings concerning the financial performance of JJMDB's robotic and digital surgery ecosystem "Digital, Inc." (*Id.* at 21–27.) In his deposition, Randall did not dispute his prior exposure to some of the above projects and documents; instead, Randall admitted they were confidential and should not be shared with a competitor. (*Id.* at 21–24, 26, 28–29; ECF No. 37-1 at 118, 124–26, 130, 135, 144–46, 148, 150–54, 157–58, 160.) Therefore, Plaintiffs have at least identified some confidential information that Randall was exposed to solely due to his employment with Plaintiffs. The Court finds Plaintiffs has a legitimate interest in the protection of such information.

As for the second prong on the undue hardship to the employee, the "inquiry requires the court to determine the likelihood of the employee finding other work in his or her field, and the burden the restriction places on the employee." *More*, 869 A.2d at 898 (citing *Karlin v. Weinberg*, 390 A.2d 1161, 1169 (N.J. 1978)). "Where a court finds a covenant overbroad, the court tailors the covenant's restrictions through the process of blue penciling rather than holding them to be void *per se*." *Sandhills Glob., Inc. v. Garafola*, Civ. A. No. 19-20669, 2020 U.S. Dist. LEXIS 65553, at *25 (D.N.J. Apr. 10, 2020) (citing *ADP, LLC v. Rafferty*, 923 F.3d 113, 125–26 (3d Cir. 2019)). "[A] court will consider whether a covenant's duration, geographic limits, and scope of activities must be 'narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests.'" *Id.* at *25–26 (citing *More*, 869 A.2d at 897). "[T]he reasonableness of the duration and scope of the agreement must be analyzed in view of the specific facts presented in each case." *Manhattan Assocs. v. Ruderman*, Civ. A. No. 05-3928, 2005 U.S. Dist. LEXIS 45132, at *10 (D.N.J. Sept. 20, 2005) (citations omitted).

The following analysis of the Agreement's duration and geographic limits, as well as its

scope of restricted activities, indicates the Agreement does not impose overbroad restrictions on Randall.

Regarding duration, "[a] non-compete covenant may not extend beyond the temporal point when the secret information has become obsolete." *Truong, LLC v. Tran*, Civ. A. No. A-5752-11T1, 2013 N.J. Super. Unpub. LEXIS 64, at *24 (N.J. Super. Ct. App. Div. Jan. 9, 2013) (citing *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 313 (S.D.N.Y. 1999)). "A covenant also may not extend beyond the period in which the former employee could independently replicate the protected information, so long as any research and development cost savings are adequately addressed in awarded damages or injunctive relief." *Id.* (citing *Raven v. A. Klein & Co., Inc.*, 478 A.2d 1208, 1212 (N.J. Super. Ct. App. Div. 1984)). Here, Randall alleges Larry Jones admitted any threat of harm posed by Randall working for a competitor would dissipate and become stale after twelve to fourteen months, and therefore the Agreement's restriction period of eighteen months is unreasonably long. (ECF No. 29 at 53.) However, Larry Jones only made a general estimation that, if Plaintiffs obtained a competitor's secret strategies, it would help Plaintiffs achieve certain competitive advantage over the competitor in the next twelve to fourteen months. (ECF No. 2-1 ¶ 9.) In other words, Larry Jones's estimation is based on a general hypothetical concerning a competitor's secret information, rather than the relevant specific facts of Plaintiffs or Randall, without which the Court cannot conduct an undue hardship inquiry. *See Pierson v. Med. Health Ctrs., P.A.*, 869 A.2d 901, 904 (N.J. 2005) ("We continue to adhere to the case-by-case approach for determining whether a restrictive covenant in a post-employment contract is unreasonable and unenforceable."). Therefore, the alleged admission of Larry Jones is not what Randall claims it to be, and cannot show the Agreement's restriction period is unreasonably long. On the contrary, Plaintiffs allege the life cycle of secrecy for the type of proprietary information

involved in Plaintiffs' R&D exceeds eighteen months. (ECF No. 35 at 43–44.) For example, the full VELYS launch is contemplated through 2022. (*Id.* at 44.) Therefore, Plaintiffs have demonstrated a rational basis for imposing an eighteen-month restriction period. Moreover, it is unlikely that a restriction period of eighteen months is unreasonably long for a restrictive covenant under New Jersey law. *See Touzot*, 2016 U.S. Dist. LEXIS 55766, at *33 (citations omitted) ("[T]he duration of the restrictions—two years—has . . . been found to be reasonable under New Jersey law."). Accordingly, the Court finds the duration of the Agreement's restriction on Randall is reasonable.

Regarding geographic scope, "technological advances are a factor that could increasingly affect the reasonableness of geographic limitations." *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 225 (D.N.J. 2008). "In this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated." *Id.* (citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007)); *see also Ruderman*, 2005 U.S. Dist. LEXIS 45132, at *10 ("[A] lack of a geographic limitation is not *per se* unreasonable.") (citing *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 559 (E.D.N.Y. 1995)). If the relevant industry "involves a world-wide market," and the employer "focuses upon a very narrow specialized niche within which separable geographic zones are indistinguishable," it is not unreasonable for the employer to impose a worldwide noncompetition restriction on the employee. *Mansol Indus. v. Singh*, Civ. A. No. 96-2065, 1996 U.S. Dist. LEXIS 22823, at *33 (D.N.J. Sept. 24, 1996). Here, Plaintiffs operate globally in the medical device industry. (ECF No. 2-4 at 10.) Smith & Nephew also operates globally and regards DePuy Synthes as one of its three major competitors in the fields of

orthopedics and sports medicine.[7] Accordingly, because the technological advances in this information age justify broad geographic restrictions, and because the relevant market here is specialized and involves only a few major players that compete globally, the Court finds it reasonable for the Agreement not to have geographical limitations.

Regarding restricted activities, "'the likelihood of the employee finding other work in his or her field' is an important consideration." *Sunbelt Rentals, Inc. v. Love*, Civ. A. No. 20-17611, 2021 U.S. Dist. LEXIS 4587, at *49 (D.N.J. Jan. 11, 2021) (citing *More*, 869 A.2d at 898). Also, "if the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play." *Id*. (citing *More*, 869 A.2d at 898). Here, the Agreement does not preclude Randall from working in the entire medical device field, and does not completely prohibit Randall from joining a competitor. Though J&J operates in a diversity of medical device, pharmaceutical and consumer products areas, it does not mean Randall cannot work for any other company that somehow overlaps with J&J's area of business. This is because the Agreement only prohibits Randall from working for a competitor that may benefit from Randall's use of Plaintiffs' confidential information, which Randall had exposure to in the last two years of his employment with Plaintiffs. (ECF No. 35 at 42–43.) Therefore, the Agreement's restrictions, though "relatively broad, insofar as they restrict [Randall] from working with a direct competitor of" Plaintiffs, "do allow for some flexibility, such as working for a competitor in a non-competitive role." *Sunbelt*, 2021 U.S. Dist. LEXIS 4587, at *49. "[W]hile [Randall] may not be able to perform any job that he wishes to perform, his quandary is limited." *Id*. at *49–50. Also, as discussed below, Randall "voluntarily resigned from [Plaintiffs],

---

[7] Smith & Nephew, Annual Report 2019 9, 15 (2020), *available at* https://www.smith-nephew.com/global/assets/pdf/corporate/annual%20report%202019%20interactive-1.pdf.

thereby bringing any hardships upon himself." *Id*. at *50. "As such, the Court finds that the scope of activities prohibited by the [Agreement] is reasonable." *Id*.

Having concluded the restrictions imposed by the Agreement are not overbroad, the Court turns to the voluntariness of Randall's resignation. In the undue hardship inquiry, "the reason for the termination of the parties' relationship is also relevant." *More*, 869 A.2d at 898. Employees who "voluntarily left [their employer] to join a direct competitor . . . cannot assert their termination as a hardship for [a court's] consideration." *Kusins*, 215 A.3d at 947 (citing *id*.); *see also Heartland Payment Sys., LLC v. Volrath*, Civ. A. No. 17-5323, 2017 U.S. Dist. LEXIS 213648, at *19 (D.N.J. Dec. 30, 2017) (citations omitted) ("If an employee did roll the dice by voluntarily quitting in order to work for a competitor, the employee 'cannot self-generate hardship by arguing that he may be terminated [from new employment] because this gamble did not turn out as planned.'"); *Ethicon, Inc. v. Angelini*, Civ. A. No. 16-1124, 2016 U.S. Dist. LEXIS 138085, at *13 (M.D. Fla. Sept. 22, 2016), *vacated on other grounds*, 687 F. App'x 859 (11th Cir. 2017) (citations omitted) ("New Jersey is reluctant to find a hardship where the employee voluntarily separates in pursuit of better compensation."). An employee "voluntarily left her position with" the employer, when the employer, "even after the [employee's] tendering of her resignation, sought to persuade [the employee] to remain in [the employer's] employ." *Angelini*, 2016 U.S. Dist. LEXIS 138085, at *14 (applying New Jersey law to a noncompete agreement that Ethicon sought to enforce). In contrast, "where the employer causes the parties to separate," enforcement of the covenant may cause undue hardship on the employee "in that the employee has not, by his conduct, contributed to it." *More*, 869 A.2d at 898. For example, if an employee's resignation was prompted by a "reasonable uncertainty of future job security" caused by the employer, such as significant layoffs of other employees, then the court may find enforcing the restrictive covenant will impose undue

hardship on the employee, *Marinelli v. Medco Health Sols., Inc.*, 951 F. Supp. 2d 303, 321–22 (D. Conn. 2013) (analyzing the enforceability of a noncompete clause under New Jersey law), though such an uncertainty "does not guarantee a finding of an undue burden in such a situation." *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 431 (E.D. Pa. 2017) (applying New Jersey law to a noncompete agreement that Depuy Synthes sought to enforce).

Here, Randall concedes "he voluntarily resigned his employment with Ethicon." (ECF No. 29 at 37.) Also, nothing in the record shows Plaintiffs caused Randall to resign. On the contrary, Plaintiffs, upon hearing Randall's intent to resign, tried to retain Randall by exploring other opportunities for him within J&J, because Randall was seen as a talented individual that J&J wanted to keep. (ECF No. 35 at 40.) For example, Plaintiffs offered Randall a position of Senior Director of Operations within the Company. (ECF No. 37-5 at 90.) Plaintiffs' failure to extend a former offer to Randall does not render Randall's resignation involuntary, because it does not indicate an unwillingness of Plaintiffs to retain Randall. Instead, it was likely due to the rather short timeframe that Randall left with Plaintiffs to make a formal offer. After declining Smith & Nephew's initial approach to him in early 2020, Randall renewed discussions with Smith & Nephew about a potential position in late July 2020, and the discussions continued through August 2020. (ECF No. 37-1 at 75.) Around August 21, 2020, Randall informed his manager, Celine Martin, of his considerations for a role with Smith & Nephew. (No. 37-4 at 41, 138.) Soon after that, Celine Martin exchanged by email with some other J&J executives on Randall's possible resignation from his position, and by Thursday, August 27, 2020, they together identified several potential alternative positions within the Company for Randall to choose from. (ECF No. 37-26.) Before Celine Martin and her colleagues could finalize a formal offer for Randall, on the next Monday, August 31, 2020, Randall announced his resignation from Ethicon. (ECF No. 29 at 14.)

Speaking of the failure to extend a formal offer, Celine Martin said she "was not in a position to do it that fast" (ECF No. 37-4 at 138), which the Court finds was a rational explanation based on undisputed facts in the record.

Also, Randall's resignation was not out of a concern for job instability, like the employee's concern in *Marinelli*. *Marinelli* is distinguishable, because the employee in *Marinelli* (1) was not persuaded by his employer to remain in its employ after announcing his intent to resign; (2) had a concern for job security, which was caused by not only the significant layoffs in his office, but also the short time window within which the employer guaranteed significant severance benefits;[8] and (3) had his fear of job security further confirmed by the significant salary reductions reported by the employer after the employee's resignation. *Marinelli*, 951 F. Supp. 2d at 312, 321–22. Compared with the employee in *Marinelli*, Randall has much weaker grounds to allege a reasonable uncertainty of job security, because (1) Plaintiffs tried to retain Randall after he announced the intent to resign, and (2) nothing in the record indicates actual significant reductions of salary and benefits in Randall's previous office or branch at Plaintiffs around the time of his resignation. Therefore, the Court finds Randall resigned from Plaintiffs voluntarily to join Smith & Nephew, which, as illustrated in Part III.C.1.c, *infra*, is a direct competitor of Plaintiffs. As a result, the Court declines to find undue hardship on Randall.

As for third prong, the court "must consider whether enforcement of the [restrictive covenant] causes harm to the public." *Kusins*, 215 A.3d at 947. As discussed in Part III.C.4, *infra*, the Court does not discern any injurious effect to the public that weighs against enforcing the Agreement.

---

[8] The employer in *Marinelli* had significant layoffs after being acquired in April 2012, and its management had guaranteed significant severance benefits until April 2013.

Accordingly, the Court finds the Agreement valid.

### c.    Randall Likely Has Breached or Will Breach the Agreement

Randall denies having breached the Agreement, because he has not started working at Smith & Nephew, and there is no evidence showing he has disclosed Plaintiffs' confidential information and trade secrets to Smith & Nephew. (ECF No. 29 at 42–43.) Randall maintains Plaintiffs cannot enforce the Agreement, because they have not shown the risk that Randall will disclose or use Plaintiffs' confidential information at Smith & Nephew. (*Id.* at 44.) Randall alleges any confidential information that he may have regarding DePuy Synthes has become stale after he left DePuy Synthes in October 2019, and his employment with Ethicon does not conflict or overlap with his new position at Smith & Nephew. (*Id.* at 46.) Plaintiffs contend, unless enjoined, Randall will breach the plain language of the Agreement. (ECF 4-2 at 32.) Plaintiffs also point to several specific instances of breach that Randall already completed preceding his departure from J&J. (ECF No. 34 at 32–33.) The Court agrees.

"Proof of previous violations [by the employee] is not required to grant injunctive relief; [the employer] need only show a likelihood that [the employee] will, in the future, violate the restrictive covenant." *Heartland Payment*, 2017 U.S. Dist. LEXIS 213648, at *22–23. "While 'past actions cannot be remedied through injunctive relief, such facts can be considered as to the strength of [the plaintiff employer's] proof.'" *Id*. at *23. Therefore, even if Randall did not breach the Agreement, it does not preclude granting a preliminary injunction here. Moreover, the proofs of Randall's past breaches of the Agreement, if any, will support Plaintiffs' application for preliminary injunction.

Here, Randall likely violated Section 2.4 of the Agreement, which prohibits an employee from retaining any confidential information of the Company upon terminating the employment

without permission. (ECF No. 1, Ex. A ¶ 2.4.) On August 20, 2020, Randall forwarded to his personal email account an email containing salary, bonus, and long-term incentive information for key managerial positions within the Company. (ECF No. 34 at 32.) Randall concedes the above information is confidential, should not be shared with a competitor, and was sent to his personal email without Plaintiffs' permission. (ECF No. 37-1 at 93–95.)

Also, Randall likely violated Section 3.4 of the Agreement, which requires an employee who voluntarily resigns to notify the employer in writing of the employee's departure at least fourteen days before the anticipated last day of employment; and also requires the employee or the competitor that the employee will join to provide written assurances satisfactory to Plaintiffs within fourteen days before the employee assumes a new role with the competitor. (ECF No. 1, Ex. A ¶ 3.4.) First, Randall does not allege having sent any written notification of his resignation to Plaintiffs at least fourteen days before his last day at Plaintiffs. Randall states, before his official resignation, he had a phone conversation with Celine Martin about his considerations of a potential role at Smith & Nephew. (ECF No. 37-1 at 91.) But a phone conversation does not suffice as a writing. On August 31, 2020, Randall sent to Celine Martin his resignation email, where he anticipated September 11, 2020, as his last day at the Company. (ECF No. 37-27 at 2.) Though the email is in writing, it was not sent within fourteen days before Randall's anticipated last day of employment. Second, neither Randall nor Smith & Nephew alleges any written assurance was actually sent to Plaintiffs. Randall admits he is not aware of any written assurance provided to Plaintiffs. (ECF No. 37-1 at 92.)

Randall likely will violate Section 3.2, which prohibits an employee, within eighteen months after his or her resignation, from working for a competitor in a way that may benefit the competitor by using or disclosing the Company's confidential information. (ECF No. 1, Ex. A ¶

3.2.) First, Smith & Nephew is a direct competitor of Plaintiffs. Randall does not dispute Smith & Nephew is a competitor of DePuy Synthes, but maintains Ethicon does not compete with Smith & Nephew.[9] (ECF No. 29 at 53.) The Court finds Ethicon is also a competitor of Smith & Nephew, because Smith & Nephew is developing advanced technologies in robotics and digital surgery, and Ethicon is doing the same. On the one hand, Randall concedes Ethicon is to be integrated into "a newly combined Robotics and Digital Solutions organization" and leveraged "to accelerate the development of a differentiated surgical robotic platform and digital solutions." (ECF No. 37-1 at 48, 196.) Also, DePuy Synthes and Ethicon are jointly developing innovative digital data analytical ecosystems to support robotic products. (ECF No. 2-4 at 8.) On the other hand, the Head of Robotics position that Randall intends to take at Smith & Nephew involves the responsibility of driving the overall strategy of Smith & Nephew's digital surgery ecosystem and leading the development of robotic technologies. (ECF No. 37-9 at 4.) Second, as discussed in Part III.C.1.b, *supra*, Randall was exposed to a significant amount of specific confidential information relating to Plaintiffs' robotic and digital surgery development during his employment with Plaintiffs. Third, there is a substantial overlap of job responsibilities between Randall's positions at Plaintiffs and Smith & Nephew, which suggests the confidential information Randall had exposure to while working for Plaintiffs likely will benefit his future work with Smith & Nephew. Like Randall's

---

[9] Randall refers to certain alleged admissions of Larry Jones and Celine Martin that Smith & Nephew does not compete with Ethicon. (ECF No. 29 at 53.) However, these alleged admissions are not what Randall claims them to be. Larry Jones only meant Smith & Nephew did not compete with Ethicon on a specific product, *i.e.*, Ethicon's iPlatform. (ECF No. 32 at 125.) Celine Martin stated she was not concerned with Randall joining Smith & Nephew, based on the information Randall provided to her pertaining to the scope of his work with Ethicon. (ECF No. 37-4 at 43.) Celine Martin stressed her comments on Randall's departure were made in the context of a conversation that was very partial and lacked extreme substance. (*Id.* at 43–44.) Therefore, neither Larry Jones nor Celine Martin claimed there was no competition between Smith & Nephew and Ethicon.

previous role at Plaintiffs,[10] Randall's Head of Robotics position at Smith & Nephew also involves a leadership role in developing a robotics and digital surgery ecosystem. Moreover, Plaintiffs point out Randall intends to work at Smith & Nephew's R&D Center in Pittsburgh, which is dedicated to Smith & Nephew's robotic and digital surgery development. (ECF No. 35 at 34.) Fourth, Randall does not meet the exception to Section 3.2 as "provided in Section 3.3." (ECF No. 1, Ex. A ¶ 3.2.) Section 3.3 allows Randall to work for a competitor if several requirements are met. (*Id.*, Ex. A ¶ 3.3.) One of the requirements is that Randall or the competitor shall provide written assurances to Plaintiffs to indicate Randall will not render services to the competitor in conflict with Randall's obligations under the Agreement. (*Id.*) As previously discussed, neither Randall nor Smith & Nephew alleges to have sent Plaintiffs such written assurances. Therefore, unless enjoined, Randall likely will violate Section 3.2 by benefiting Smith & Nephew with Plaintiffs' confidential information in an area where Smith & Nephew and Plaintiffs directly compete.

Accordingly, the Court concludes Plaintiffs have demonstrated a reasonable likelihood that Randall has breached the Agreement, and, unless enjoined, will breach the Agreement.

### d.    Plaintiffs, Having Performed Their Contractual Obligations, Will Likely Suffer Damages Due to Randall's Breach

The Court finds Plaintiffs have demonstrated a reasonable likelihood of success on the remaining two elements of a breach of contract claim. First, Randall's likely disclosure or use of Plaintiffs' confidential information to the benefit of Smith & Nephew can cause damages to Plaintiff's revenue and goodwill. *See Scholastic Funding Grp., LLC v. Kimble*, Civ. A. No. 07-557, 2007 U.S. Dist. LEXIS 30333, at *19 (D.N.J. Apr. 24, 2007) ("[H]aving [the employer's]

---

[10] Randall's resume submitted to Smith & Nephew, LinkedIn profile, and internal performance evaluation at J&J indicate Randall's leadership role in building the Company's robotics and digital surgery ecosystem. (ECF No. 2-4 at 12–15.)

direct competitor gain access to its confidential business information will likely result in lower revenues, thus causing damages."). Second, Plaintiffs have performed their own obligations under the Agreement by hiring Randall, who concedes his employment with DePuy Synthes served as the consideration for Randall to execute the Agreement. (ECF No. 29 at 19.) Therefore, Plaintiffs have shown a reasonable likelihood that Plaintiffs, having performed their own contractual obligations, will sustain damages due to Randall's breach.

Accordingly, Plaintiffs have established a likelihood of success on the merits of the breach of contract claim against Randall.

### 2.    Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction

"Harm is considered 'irreparable' if it is not redressable by money damages later, in the ordinary course of litigation." *ADP, LLC v. Olson*, Civ. A. No. 20-3312, 2020 U.S. Dist. LEXIS 200635, at *35 (D.N.J. Oct. 28, 2020) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)). "Injunctive relief is also appropriate because of the practical difficulties in establishing causation and damages." *Menasha Packaging Co., LLC v. Pratt Indus.*, Civ. A. No. 17-75, 2017 U.S. Dist. LEXIS 22318, at *28 (D.N.J. Feb. 15, 2017) (citations omitted). The movant for a preliminary injunction "has the burden of proving a 'clear showing of immediate irreparable harm' absent injunctive relief." *Id.* (citing *ECRI v. McGraw-Hill Inc.*, 809 F.2d 223, 225 (3d Cir. 1987)). Here, Plaintiffs have met this burden.

### a.    Randall's Acknowledgement in the Agreement Is Not Sufficient to Prove Irreparable Harm

Plaintiffs state Randall has acknowledged in Section 5.1 of the Agreement that any violation of the Agreement causes Plaintiffs irreparable harm, which warrants the imposition of temporary and/or permanent injunctive relief. (ECF No. 2-4 at 33.) Plaintiffs suggest, by accepting the Head of Robotics position with Smith & Nephew, Randall breaches the Agreement, and

therefore automatically causes Plaintiffs irreparable harm. (*Id*.) The Court disagrees.

Randall's acknowledgement in the Agreement is not dispositive in the irreparable harm inquiry, because "a contractual provision simply cannot act as a substitute for a finding by this Court that determines whether a preliminary injunction is proper." *AV Sols., LLC v. Keystone Enter. Servs., LLC*, Civ. A. No. 11-3503, 2011 U.S. Dist. LEXIS 78882, at *8 (D.N.J. July 19, 2011) (citing *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 758 (D.N.J. 1998)). The Court "must make its own determination of whether there has been irreparable harm." *Menasha*, 2017 U.S. Dist. LEXIS 22318, at *26 (citing *Laidlaw*, 20 F. Supp. 2d at 766).

> **b.  Randall's Alleged Compromising of Confidential Information Relating to Plaintiffs' Businesses May Establish Irreparable Harm**

Plaintiffs state, unless immediately enjoined, Randall will join Smith & Nephew in a top executive and R&D position in direct violation of the Agreement, causing Plaintiffs to suffer irreparable harm by compromising confidential information relating to Plaintiffs' businesses. (ECF No. 2-4 at 32–35.) Plaintiffs claim it would be impossible for Randall to perform his duties at Smith & Nephew without a significant risk of using or disclosing Plaintiffs' confidential information. (ECF No. 35 at 35.) Randall counters Plaintiffs fail to establish immediate irreparable injury. (ECF No. 29 at 47.) Randall regards Plaintiffs' assertion of irreparable injury as mere conjecture, because no evidence shows Randall actually will disclose Plaintiffs' confidential information to Smith & Nephew or how Smith & Nephew will benefit from Randall's disclosure. (*Id.* at 48–49.) On the contrary, Randall testified under oath that he would not, and his new position would not require him, to disclose any confidential information to Smith & Nephew. (ECF No. 42 at 4.) Moreover, Randall alleges he entered into an agreement with Smith & Nephew that prohibited Randall from disclosing Plaintiffs' confidential information to Smith & Nephew. (*Id.*) The Court disagrees.

"[T]he disclosure of confidential and proprietary information . . . may be the basis for a finding of irreparable harm." *Laidlaw*, 20 F. Supp. 2d at 766 (citations omitted). "In the context of non-competition agreements, irreparable injury may be shown if the former employee may avail himself of sensitive product strategies both as to development and marketing, which may be of extreme value to the competitor." *ADP, LLC v. Jacobs*, Civ. A. No. 15-3710, 2015 U.S. Dist. LEXIS 103207, *17 (D.N.J. Aug. 5, 2015) (citations and internal quotations omitted). "Where a party is in possession of another party's confidential information and is poised to use or disclose such information, there is a likelihood of irreparable harm." *Jackson Hewitt Inc. v. Cline*, Civ. A. No. 14-6931, 2015 U.S. Dist. LEXIS 147167, at *12 (D.N.J. Oct. 29, 2015) (citations omitted). "[A]n imminent possibility of disclosure of confidential information is sufficient to support a finding of irreparable harm." *Chemetall*, 2016 U.S. Dist. LEXIS 38590, at *53–54 (citations omitted).

As discussed in Part. III.C.1.b, *supra*, Randall, during his employment with Plaintiffs, was exposed to Plaintiffs' confidential information concerning business strategies, product pipeline, financial condition, internal organization, and acquisition. Such confidential information relates to Plaintiffs' robotic and digital surgery business, an area where Smith & Nephew, as discussed in Part. III.C.1.c, *supra*, directly competes with Plaintiffs and intends Randall to take a leadership role. Therefore, though Randall has not started working for Smith & Nephew, Randall's use of Plaintiffs' confidential information in his capacity for Smith & Nephew is imminent and inevitable. *See Jacobs*, 2015 U.S. Dist. LEXIS 103207, at *17–18 (finding an imminent threat of disclosure of the plaintiff's trade secrets, given the defendant's taking of a similar position with a direct competitor of the plaintiff and significant prior exposure to the plaintiff's proprietary information); *Strom*, 621 F. Supp. 2d at 229–30 (concluding that the defendant employee's use of

his former employer's (*i.e.*, the plaintiff) confidential information in his capacity for a new employer was potentially inevitable, though the defendant had not started working for the new employer, because: (1) the new employer was a direct competitor of the plaintiff; (2) the defendant significantly involved and participated in the plaintiff's strategic business decisions; and (3) the defendant knew the plaintiff's strategies for its New Jersey branches).

Randall's promise not to use Plaintiffs' confidential information while working for Smith & Nephew does not change the conclusion. Even if a former employee swore "he would not disclose any confidential information while working for the competitor, and the competitor also directed the employee not to disclose any confidential information," a court may find irreparable harm to the former employer. *Heartland Payment*, 2017 U.S. Dist. LEXIS 213648, at *24 (citing *Fres-co Sys. USA v. Hawkins*, 690 F. App'x 72 (3d Cir. 2017)); *see also Babn Techs. Corp. v. Bruno*, 1998 U.S. Dist. LEXIS 13591, at *21 (E.D. Pa. Aug. 28, 1998) (finding that "it [wa]s virtually inconceivable for [the defendant employee] to avoid utilizing confidential information . . . that he learned at" the plaintiff employer, despite the defendant's "benign intent not to divulge purposefully any confidential information of" the plaintiff). This is because the former employee who begins serving a competitor may have "changed loyalties," and may be willing to disclose the former employer's confidential information or "allow the information to influence his actions while working for the competitor to the detriment of" the former employer. *Heartland Payment*, 2017 U.S. Dist. LEXIS 213648, at *24 (citing *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 174 (3d Cir. 2015)); *see also Synthes*, 228 F. Supp. 3d at 441 (citing *Angelini*, 2016 U.S. Dist. LEXIS 138085, at *20) (finding that it "strain[ed] credulity to think" the former employee, while working for his new employer, "w[ould] be able to perform tasks and make strategic recommendations," which "substantial[ly] overlap[ed]" with his duties while working for the

former employer, "without relying on" the former employer's confidential information).

Therefore, without a preliminary injunction, Plaintiffs will likely suffer irreparable harm to their business due the imminent possibility of Randall's disclosure of their confidential information.

### 3.    Balancing of Hardships Favors Issuing a Preliminary Injunction

Plaintiffs maintain the balance of equities weighs in their favor. (ECF No. 2-4 at 36.) Plaintiffs insist they would suffer great hardships without a preliminary injunction, because their confidential information will be in the hands of a direct competitor. (*Id.*) Plaintiffs argue any harm to Randall caused by an injunction will be minimal, because (1) the restrictions in the Agreement are reasonable and temporary; (2) even if an injunction is issued, Smith & Nephew will honor its offer and financial commitment to Randall, who would make more money than he did with Plaintiffs; and (3) Plaintiffs have offered Randall options to stay with the Company and offered to pay his salary during the pendency of these injunction proceedings, which Randall rejected. (*Id.*; ECF No. 35 at 44.) Randall argues Plaintiffs will not suffer nearly as much harm as Randall will suffer if Plaintiffs' motion is denied. (ECF No. 29 at 53.) The Court disagrees.

In balancing the hardships, a court must ensure "the injunction does not harm the defendants more than denial of the injunction would harm the plaintiff." *Jackson*, 2015 U.S. Dist. LEXIS 147167, at *13 (citing *Strom*, 621 F. Supp. 2d at 230). A court must "analyze whether the defendants will suffer irreparable harm if the preliminary injunction is granted," and "should not consider financial damages when deciding whether to grant an injunction." *Strom*, 621 F. Supp. 2d at 230 (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 727–28 (3d Cir. 2004)). Here, Randall is unlikely to sustain severe hardships if a preliminary injunction is granted. Randall can always work for a non-competitor. Also, the injunction will not prohibit Randall from working for

a competitor, so long as he satisfies the requirements in Section 3.3 of the Agreement. After a reasonable restriction period of eighteen months ends, Randall may work for a competitor in the fullest capacity. Any hardship Randall may sustain as a result of the preliminary injunction is lessened by (1) Smith & Nephew's expectation to honor its offer to Randall, including making payment to Randall during the injunction (ECF No. 37-6 at 63), and (2) Plaintiffs' offer[11] to keep Randall within the Company (ECF No. 35 at 44). In comparison, without a preliminary injunction, Plaintiffs would sustain a much severer hardship, *i.e.*, the imminent threat of having a direct competitor using and benefiting from their confidential information. Therefore, a preliminary injunction will not harm Randall more than denial of the injunction would harm Plaintiffs.

Moreover, in deciding the balance of equities, "courts are not sympathetic to employees who bring hardships upon themselves." *Heartland Payment*, 2017 U.S. Dist. LEXIS 213648, at *25–26. "The 'injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.'" *Strom*, 621 F. Supp. 2d at 230 (citing *Kos Pharms.*, 369 F.3d at 728). Here, Randall brought hardships upon himself in two ways. First, he voluntarily chose to leave Plaintiffs to go to a direct competitor. *Menasha*, 2017 U.S. Dist. LEXIS 22318, at *30 (citing *HR Staffing Consultants*, 627 F. App'x at 173) ("[T]he [i]ndividual [d]efendants themselves voluntarily chose to leave [the plaintiff employer] to go to a direct competitor, thus they 'brought any hardship upon [themselves].'"). Second, Randall likely willfully breached Section 2.4 of the Agreement.[12] *Heartland Payment*, 2017 U.S. Dist. LEXIS

---

[11] The Court will not consider Plaintiffs' offer to pay Randall pending the court proceedings or under Addendum A of the Agreement, because it relates to Randall's financial damages as opposed to irreparable harm.

[12] Section 2.4 prohibits an employee from retaining any confidential information of the Company upon terminating the employment without permission. (ECF No. 1, Ex. A ¶ 2.4.) Randall admitted the Company information he sent to his personal email address before his departure was

213648, at *26 (citing *HR Staffing Consultants*, 627 F. App'x at 174) ("[W]hen the defendant 'willfully breach[ed] a valid restrictive covenant, the harm to [him] is a predictable consequence of [his] willful breach and . . . is not the type of harm from which we seek to protect [him].'"). This further weakens Randall's allegation of hardships resulting from a preliminary injunction.

"One other factor . . . in the balance of hardships analysis is the 'goal[] of the preliminary injunction analysis [of] maintaining the status quo, defined as the last peaceable, noncontested status of the parties.'" *Kos Pharms.*, 369 F.3d at 729 (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)). Once Randall starts working for Smith & Nephew in the absence of a preliminary injunction, Plaintiffs' confidential information may "potentially be disclosed, an injury which cannot later be undone." *Payroll Assocs., LLC v. Adaptasoft, Inc.*, Civ. A. No. 12-6375, 2012 U.S. Dist. LEXIS 199290, at *7 (D.N.J. Oct. 23, 2012). "As such, a preliminary injunction is necessary under these circumstances to temporarily maintain the status quo." *Id.*

In conclusion, the Court finds the balancing of hardships weighs in Plaintiffs' favor.

### 4.    A Preliminary Injunction Will Not Disserve the Public Interest

Plaintiffs claim the injunctive relief they seek serves the public interest by ensuring businesses are able to protect their legitimate interests in their confidential information. (ECF No. 2-4 at 37.) Randall contends, while the concern for protecting confidential information is understandable, the public interest is not served by issuing an injunction that fails to reasonably protect an employer's legitimate interests, creates an undue burden for the employee, and leaves the public to suffer from judicial nurturing of such naked restraints on competition. (ECF No. 29

---

confidential and should not be disclosed to a competitor, knew this was a violation of the Company's policy regarding distribution of confidential Company information to a personal email account, and knew he did not have permission to do so. (ECF No. 37-1 at 95–96.)

at 53–54.) The Court disagrees.

The public interest factor "instructs courts to consider the fact that 'enforcement of the restriction should not cause harm to the public.'" *ADP, LLC v. Pittman*, Civ. A. No. 19-16237, 2019 U.S. Dist. LEXIS 181274, at *50–51 (D.N.J. Oct. 18, 2019) (citing *More*, 869 A.2d at 898). Here, the Court discerns no major public component involved in a preliminary injunction, because nothing in the record indicates enforcing the Agreement may diminish the rights of the public to have free access to a particular type of good or service. *See id.* at *51 (concluding that the case "contain[ed] no major public component," because "the imposition of restrictive covenants here create[d] no injury to the rights of the public to have free access to the advice of professionals licensed by the State, as it may do in the context of physicians and accountants"); *ADP, LLC v. Trueira*, Civ. A. No. 18-3666, 2019 U.S. Dist. LEXIS 181537, at *44 (D.N.J. Oct. 18, 2019) (recognizing only two professions, *i.e.*, psychologists and attorneys, "for which a client's freedom to choose or the 'uniquely personal' nature of the relationship militate against enforcing any restrictive covenant") (citations omitted); *HR Staffing Consultants, LLC v. Butts*, Civ. A. No. 15-3155, 2015 U.S. Dist. LEXIS 71220, at *37 (D.N.J. May 29, 2015), *aff'd*, 627 F. App'x 168 (3d Cir. 2015) (identifying "two significant public interest factors a court should consider" in granting a preliminary injunction, including "the demand for the services rendered by the employee" and "the likelihood that those services could be provided by other [employees] already practicing in the area") (citing *Karlin*, 390 A.2d at 1169–70).

Further, "[j]udicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Scholastic Funding*, 2007 U.S. Dist. LEXIS 30333, at *33 (citing *Wright Med. Tech., Inc. v. Somers*, 37 F.Supp.2d 673, 684 (D.N.J. 1999)); *see also Strom*, 621 F. Supp. 2d at

230 ("[E]nforcing reasonable terms of an employment agreement is within the public interest."). The public also has an interest in ensuring "confidential business information is protected," because "unfair competition through the use of confidential and proprietary information is discouraged." *Money Mktg. v. Silver Aspen, Inc.*, Civ. A. No. 06-1414, 2006 U.S. Dist. LEXIS 105652, at *15 (D.N.J. June 8, 2006) (citations omitted). Here, the Agreement imposes reasonable restrictions on an employee to protect the employer's legitimate interests in its confidential information. In this regard, enforcing the Agreement serves the public interest. Therefore, the Court finds the public interest factor favors Plaintiffs.

Accordingly, the Court finds Plaintiffs have satisfied the four elements of the standard for issuing a preliminary injunction.

## IV.    CONCLUSION

For the reasons set forth above, Randall's Motion to Stay All Proceedings and Transfer Venue to the District of Massachusetts is **DENIED**, and Plaintiffs' Cross Motion to Enjoin Proceedings in the District of Massachusetts and Motion for a Preliminary Injunction are **GRANTED**. An appropriate order follows.


**Date: May 28, 2021**                    */s/ Brian R. Martinotti*
                                          **HON. BRIAN R. MARTINOTTI**
                                          **UNITED STATES DISTRICT JUDGE**